W. W. HORTON, PETITIONER v. FRANK GULLEDGE, HOUSING INSPEC-
TOR; ARCHIE C. ANDREWS, JR., HOUSING INSPECTOR AND ASSISTANT
BUILDING INSPECTOR SUPERVISOR FOR THE CITY OF GREENSBORO;
GREENSBORO HOUSING COMMISSION OF THE CITY OF GREENSBORO,
RESPONDENTS

No. 41

(Filed 16 December 1970)

1. Constitutional Law § 23— "law of the land" defined

The expression "the law of the land," as used in the North Caro-
lina Constitution, has the same meaning as the expression "due process
of law," Art. I, § 19, of the North Carolina Constitution (as amended
in 1970).

2. Constitutional Law §§ 1, 23— interpretation of the law of the land
clause in State Constitution

A decision of the Supreme Court of the United States construing
the Due Process Clause of the Fourteenth Amendment to the Federal
Constitution, though persuasive, does not control the North Carolina
Supreme Court's interpretation of the Law of the Land Clause in the
Constitution of North Carolina.

3. Municipal Corporations §§ 4, 29; Constitutional Law § 13— exercise of
police power — demolition of substandard house — due process

Action by a municipality, pursuant to its housing code, in ordering
the demolition of a dwelling house without compensation to the owner
thereof, and in charging the expense of demolition to the owner upon
his failure to demolish the house himself, such action being based upon
findings by the city building inspector that the house was unfit for
human habitation and that the repairs necessary to bring the house
into conformity with the housing code would cost 60% or more of the
present value of the house, is held violative of the Law of the Land
Clause of the State Constitution, where (1) the house could be repaired
so as to comply with the housing code and (2) the owner was not
afforded a reasonable opportunity to repair the house. Art. I, § 19,
of the revised N. C. Constitution (ratified in 1970); G.S. 160-182 et seq.

4. Constitutional Law § 4— standing to assert constitutional right — home-
owner threatened with demolition order

A homeowner who was faced with a municipal housing inspector's
order giving him no alternative but to demolish his home that was
declared uninhabitable by the municipality, or to pay the expense of a
demolition by the municipality, was not required to propose an alterna-
tive remedy for the condition of the house before asserting his consti-
tutional right in the courts.

5. Constitutional Law § 11; Municipal Corporations § 29— police power —
application to private property

The police power of the State, which may be delegated to munici-
pal corporations, extends to the prohibition of a use of private property

which may reasonably be deemed to threaten the public health, safety, morals, or the general welfare; and, when necessary to safeguard such public interest, it may be exercised without payment of compensation to the owner, even though the property is thereby rendered substantially worthless.

APPEAL by petitioner from *Gambill, J.*, at the 29 April 1970 Session of the Superior Court of GUILFORD, heard prior to determination by the Court of Appeals.

In 1966, pursuant to G.S. 160-182 *et seq.*, the City of Greensboro adopted an ordinance known as the Housing Code. Section 10-23(b) thereof provides that if, after notice and hearing, the Inspector of Buildings of the City determines that a building is unfit for human habitation, standards for which are prescribed in the code, he shall state in writing his finding of fact in support of such determination and shall issue an order. If the building can be brought up to the standards prescribed by the code by repairs costing less than 60% of "the *present* value of the building," the order "*shall* require the owner * * * to repair * * * such building so as to render it fit for human habitation or to vacate and close the building as a human habitation * * * ." (Emphasis added.) If repairs bringing the building up to the standards prescribed by the code "cannot be made at a cost of less than 60 percent of the *present* value of the building, the order *shall* require the owner * * * to demolish such building." (Emphasis added.) Upon failure of the owner to comply with the order of demolition, the Housing Commission may direct the inspector to cause the building to be demolished and the cost of demolition by the inspector is made a lien upon the land whereon the building was located.

The city also has enacted ordinances providing for the taking, under the power of eminent domain, for the purpose of urban renewal, of properties constituting blighted areas. The judgment of the Superior Court recites that the property here in question, 305 Gillespie Street in the City of Greensboro, "was included in the Eastside Project of the Greensboro Redevelopment Commission" but, as of the date of the judgment, "funds had not yet been appropriated for said Eastside Project."

Pursuant to the procedures prescribed by the Housing Code, an inspection was made of the dwelling house here in question, owned by Horton and occupied by his tenant. After notice and hearing, the Inspector of Buildings entered his order directing

Horton v. Gulledge

Horton to demolish the building and advising him that, upon his failure to do so, the inspector would recommend to the Housing Commission of the city that it direct the inspector to proceed with the demolition. This order set forth the following findings of fact made by the Inspector of Buildings:

"(1) That the repair, alteration or improvement of the above mentioned building cannot be made at a cost of less than 60% of the present value of the building.

"(2) That it is determined as a fact that the above building is dangerous, unsafe and unfit for human occupation because:

"General Dilapidation—building not weather tight—improper plumbing unsafe wiring—improper foundation—floors not level—holes in floor—improper floors—dilapidated siding—holes in walls and ceilings—improper attic ventilation—sagging structural members."

Horton, the owner, appealed to the Housing Commission, pursuant to the provisions of the Housing Code, asserting that the decision of the inspector was arbitrary and not supported by the facts, that the ordinance under which the inspector purported to act is contrary to the Constitution of North Carolina and to the Constitution of the United States, and that the dwelling is not unfit for human habitation.

The Housing Commission heard evidence and the contentions of counsel in the course of three meetings of the commission, including one conducted at the dwelling in question. It made the following findings of fact:

"1. That the building located at 305 Gillespie Street is unfit for human habitation and dangerous; and

"2. That the repairs, alterations or improvements of said building *necessary to bring it into conformity with the Greensboro Housing Code* cannot be made at a cost of less than 60 percent of the present value of the building." (Emphasis added.)

The Housing Commission thereupon affirmed the decision and the order of the Inspector of Buildings.

Horton petitioned the Superior Court for a writ of *certiorari*. He alleged therein that the order of demolition amounts to a taking of his property without due process of law

in violation of the Fourteenth Amendment to the United States Constitution and, if carried out, would take his property without just compensation and deprive him thereof in violation of Art. I, § 17, of the Constitution of North Carolina. He further alleged that there was no competent evidence before the Inspector of Buildings or before the Housing Commission which would support such order and that competent evidence, introduced by Horton, showed the building "was not sixty percent (60%) dilapidated" but was suitable for human habitation.

The Superior Court issued its writ of *certiorari,* thereby staying the carrying out of the order of demolition until the matter could be heard by that court.

By agreement of the parties, the hearing in the Superior Court was had without a jury, the court considering the transcript of the testimony before the commission and exhibits, including the Housing Code of the city. The Superior Court approved and affirmed the findings and the decision of the Housing Commission, but stayed the order to demolish the building pending this appeal.

The evidence at the hearing before the Inspector of Buildings consisted of the testimony of a city housing inspector describing numerous conditions in the building, which he deemed to constitute defects making it unsuitable for human habitation, and stating his estimate of the cost of repairing such defects and his valuation of the building. He valued the building at $2,000 and estimated that it would cost a total of $2,800 "to put it into condition."

At the hearing before the Housing Commission, the same inspector testified. He recounted the defects observed by him in the building, estimated the value of the house to be $3,000 and the cost of repair "to bring up to minimum standards," to be $2,800. He expressed the opinion, based upon his findings, that "the house was dilapidated, decayed, unsanitary and in a state of disrepair likely to cause sickness, or disease or to work injury to the health, safety and welfare of the occupants." Upon cross examination he gave a breakdown of his estimate of repair costs, item by item, stating that he had never been in the building construction business and had obtained no cost estimates but based his conclusions upon his own general experience. The Assistant Inspector of Buildings testified before the commission that Horton, the owner, had made no counterpro-

posal as to repair of the property, but has requested several times that he be granted permission "to make repairs on his own grounds."

The evidence offered by the owner before the commission consisted of testimony by the owner's rental agent, who estimated the value of the house to be about $2,000 and the cost of repairs necessary "to put it in what you would consider first class rental condition" to be not over $650. In his opinion, the property is not depleted as much as 60% and the expenditure of $650 for repairs would bring the house into conformity with the Greensboro Housing Code. He was also of the opinion that the condition of the house "is because of the condition of the tenants."

The three other witnesses for the owner were men of considerable experience in the business of construction and maintenance of houses in the City of High Point. None of them was familiar with the provisions of the Greensboro Housing Code, but they expressed their several opinions that the house was presently fit for human habitation, or could be made so with the expenditure for repairs of from $500 to $700, and that its present value was from $2,200 to $2,800. One of these witnesses, who had inspected the house shortly before testifying, was of the opinion that it is suitable for human habitation and is not dangerous, though it needs cleaning badly due to "filth that was in the house," which had nothing to do with its structural condition. The house rents for $10.00 a week.

*Frazier, Frazier & Mahler by Robert H. Frazier and Harold C. Mahler for appellant.*

*Jesse L. Warren, City Attorney, and William I. Thornton, Jr., Assistant City Attorney, for appellees.*

LAKE, Justice.

The evidence, though in conflict, includes testimony which supports the findings of fact made by the Housing Commission and approved by the Superior Court. Consequently, for the purpose of this appeal, we accept as true the findings that the petitioner's house is presently unfit for human habitation and dangerous, and that repairs *necessary to bring it into conformity with the Housing Code* will cost 60%, or more, of the present value of the building. These findings were made after notice and

after a hearing in which the record discloses no failure to comply with prescribed procedures.

The finding that the petitioner's house is unfit for human habitation would authorize the city to forbid the use of it for such purpose while it remains in that condition. See *Dale v. Morganton,* 270 N.C. 567, 155 S.E. 2d 136. That, however, is not the question presented in this case. This Court has recognized the authority of a city to order the removal of a structure unlawfully erected in violation of its valid zoning ordinance. *In re Appeal of Parker,* 214 N.C. 51, 197 S.E. 706. That, also, is not the question before us. In *State v. Walker,* 265 N.C. 482, 144 S.E. 2d 419, we affirmed the conviction of the owner of a dwelling house, charged with remodeling and repairing it himself, without first applying for and obtaining a permit from the city. There, as here, the city's Superintendent of Building Inspection had ordered the dwelling demolished, having found it unfit for habitation, but, unlike the present case, it was found in the Walker case that the house could neither be altered nor improved so as to comply with the minimum requirements of the city's housing code. Nevertheless, the judgment which this Court affirmed imposed a sentence suspended on condition that the owner comply with the city's housing code within thirty days. The question in that case was not the authority of the city to demolish the building without paying for it, but the authority of the city to prohibit the making of repairs without a permit. It is within the police power of the State to establish minimum standards of design and materials in the construction of buildings for the safety of the occupants, their neighbors and the public, and this power may be and has been delegated to cities and towns. *State v. Walker, supra.* This, too, is not the question now before us.

We have, in numerous recent decisions, also recognized that the State may delegate, and has delegated, to cities the power to take private property in slum areas under the power of eminent domain, upon payment to the owner of just compensation therefor, the city's purpose being to destroy structures thereon and then to resell the land so as to redevelop the area or to construct thereon low cost housing to be owned by the city and leased to tenants. See: *Redevelopment Commission v. Hagins,* 258 N.C. 220, 128 S.E. 2d 391; *Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688; *Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693. On the other hand, we have held that

even the State, itself, may not, under the guise of the police power, regulate the use of property for aesthetic reasons which have no real or substantial relation to the public health, safety or morals, or to the general welfare. *State v. Brown* and *State v. Narron,* 250 N.C. 54, 108 S.E. 2d 74. It is well established that a municipal corporation has no inherent police power, but may exercise such power only to the extent that it has been conferred upon the city by statute. *Dale v. Morganton, supra; State v. Furio,* 267 N.C. 353, 148 S.E. 2d 275. Obviously, the Legislature cannot confer upon a city a power which the Legislature, itself, does not have. Consequently, a city may not, under the guise of the police power, destroy private property for aesthetic reasons alone.

[1, 2]  In *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27, the Supreme Court of the United States said, "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well balanced as well as carefully patrolled." The expression "the law of the land," as used in Art. I, § 17, of the Constitution of North Carolina (Art. I, § 19, of the amended Constitution, ratified at the general election in 1970), has the same meaning as the expression "due process of law." *State v. Ballance,* 229 N.C. 764, 51 S.E. 2d 731. Nevertheless, a decision of the Supreme Court of the United States construing the Due Process Clause of the Fourteenth Amendment to the Federal Constitution, though persuasive by reason of our respect for the views of that Court, does not control our interpretation of the Law of the Land Clause in the Constitution of North Carolina. Consequently, the above quoted declaration in the Berman case does not release the General Assembly of North Carolina, or its delegatee, from limitations imposed upon it by the Law of the Land Clause as construed by this Court.

The solution of the question before us in the present case is, therefore, not determined by any of the above cited decisions. The present question is:

[3]  May a city of this State, pursuant to an ordinance adopted under the authority of G.S. 160-182 *et seq.,* upon finding that a dwelling house therein is unfit for human habitation and that repairs, sufficient to bring it into compliance with the city's housing code, will cost 60% or more of the value of the unrepaired building, demolish the building without paying compensation to the owner, and fasten upon the lot a lien for

the cost of the demolition, without giving the owner a reasonable opportunity to bring the building into conformity with the Housing Code?

We hold that the city may not do so under the circumstances of this case.

**[4]** The record discloses that this petitioner has made no specific proposal to the city for the repair of his house. However, the order served upon him and the ordinance upon which it rests do not offer him that alternative to demolition of the building. He was served with the blunt direction, Destroy the house within the time specified or the city will do so and charge you for the expense of its demolition. The ordinance is mandatory in its terms. It leaves the Inspector of Buildings and the Housing Commission no alternative to destruction when the cost of repair will exceed 60% of the unrepaired value of the building. Faced with such an order and such an ordinance, the owner is not required to propose an alternative remedy for the undesirable condition of his building before asserting his constitutional right in the courts.

The city does not contend that this house cannot be repaired so as to bring it into conformity with the standards prescribed in its Housing Code. It does not rely upon, or find, the existence of a threat to the safety of persons or property so imminent that immediate destruction of the building is necessary to avoid the danger. Cases dealing with destruction of animals afflicted with an infectious disease, with destruction of contaminated food or destruction of a type of tree which, by its inherent, unalterable nature is a breeding place for a parasite which destroys another, more valuable type of tree are not in point here. See *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568.

This property is located in an area designated by the city's Redevelopment Commission as a project to be carried out by that commission. The fact that the city does not have available, or has not appropriated to its Redevelopment Commission, funds for purchasing the property, or for taking it by eminent domain, does not confer upon the city the power to take it for destruction without compensation.

The city's argument that Horton's property is not to be taken under the order in question because he will still retain the legal title to the lot, subject to a lien for the cost of demolishing

the house, is not convincing. Horton now owns a house and a lot unencumbered. If the order of the Housing Commission be carried out, he will then own only a lot and it will be subject to a lien. This is not a regulation of the use of his property. This is depriving him of a substantial part thereof. The Law of the Land Clause of the State Constitution forbids this to be done without compensation except when necessary to protect the public health, safety, or morals or the general welfare.

Taking the city's evidence at its full face value, the unrepaired house is fairly worth $3,000 over and above the value of the lot on which it is located. By an expenditure of $2,800 for repairs, Horton can bring the house up to the specifications of the Housing Code for human habitation. Obviously, such expenditure will substantially enhance the present value of the building. Let us assume that the repaired and rehabilitated house will be worth only $5,000 over and above the value of the lot. The order of the Housing Commission denies Horton the right to own a $5,000 house in return for an expenditure of $2,800 and leaves him, instead, with an empty lot subject to a lien for the cost of removing the building.

The Ohio Court of Appeals had before it a similar case in *Abraham v. City of Warren,* 67 Ohio App. 492, 37 N.E. 2d 390. In holding that the city could not destroy the building there in question without affording the owner an opportunity to make it safe for occupancy, the Court said:

"The only warrant for public interference with plaintiff's building is to secure public safety and to protect the health of those occupying the building. * * *

" 'Desirable as it might be from an aesthetic point of view to have public control of private building, the law does not permit an invasion of private rights on such grounds.' *Maxedon v. Rendigs,* Com'r of Buildings [9 Ohio App. 60, 63] * * *

"It is not the province of this court, and this court will not undertake to decide as an economic proposition whether it would be more desirable for plaintiff to raze the present structure to the foundation and use the material and the cost of repair for the erection of another structure upon that foundation, or to repair and rebuild the present structure. That is a matter in which the plaintiff is entitled to

act upon her own choice and judgment, so long as she pays due regard to the right of the public, and tenants of the building, to secure proper safety and sanitary conditions. Even though it might be entirely unwise from a financial viewpoint for the owner to undertake to preserve so much of her building as is admitted to be safe, she has the right to and is acting within her rights in so doing, so long as she does not impair the lives or property of others maintaining the structure so rebuilt."

The order of demolition in this case, if carried out, would clearly deprive the plaintiff both of property presently owned by him and of the liberty to invest in its improvement. This case is distinguishable from the numerous decisions sustaining the power of a city to forbid the substantial repair and restoration of a building in a fire district, or other area zoned for restricted use, which building, having been in such district prior to its establishment, was permitted to remain therein as a nonconforming use. See: *State v. Lawing,* 164 N.C. 492, 80 S.E. 69; *Zalk & Josephs Realty Co. v. Stuyvesant Insurance Co.,* 191 Minn. 60, 253 N.W. 8; *City of Odessa v. Halbrook,* 103 S.W. 2d 223 (Tex. Civ. App.).

As Mr. Justice Holmes, speaking for the Supreme Court of the United States, said in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

[5] It is quite true that the police power of the State, which it may delegate to its municipal corporation, extends to the prohibition of a use of private property which may reasonably be deemed to threaten the public health, safety, or morals or the general welfare and that, when necessary to safeguard such public interest, it may be exercised, without payment of compensation to the owner, even though the property is thereby rendered substantially worthless. *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; *McQuillin, Municipal Corporations,* § 24.552. However, the limit of the police power is the reasonable necessity for the action in order to protect the public. *Prichard v. Commissioners,* 126 N.C. 908, 36 S.E. 353; *Moll Co. v. Holstner,* 252 Ky. 249, 67 S.W. 2d 1; Appeal of Medinger, 377 Pa. 217, 104 A 2d 118. In 16 AM. JUR. 2d, Constitutional Law, § 290, it is said:

Horton v. Gulledge

"The police power does not include power arbitrarily to invade property rights. [Citing, *Washington ex rel Seattle Title Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210, 86 A.L.R. 654.] The lawmaking authorities may not, under the guise of police power, impose restrictions which are unnecessary and unreasonable upon the use of private property. Police regulation of the use or enjoyment of property rights can only be justified by the presence of a public interest, and such rights may be limited only to the extent necessary to subserve the public interest."

Again, the same authority states in § 368:

"[P]ublic necessity is the limit of the right to destroy property which is a menace to public safety or health and the property cannot be destroyed if the conditions which make it a menace can be abated in any other recognized way."

[3] In the instant case, it appears from the findings of the Housing Commission that the house in question can be repaired so as to comply with the city's Housing Code, be suitable for human habitation and be no longer a threat to public health, safety, morals or general welfare. To require its destruction, without giving the owner a reasonable opportunity thus to remove the existing threat to the public health, safety and welfare, is arbitrary and unreasonable. Such power may not be delegated to or exercised by a municipal corporation of this State by reason of Art. I, § 17, of the Constitution of North Carolina (Art. I, § *19,* of the revised Constitution, ratified at the general election of 1970).

We do not have before us the question of the authority of the city to destroy this property, without paying the owner compensation therefor, in the event that the owner does not, within a reasonable time allowed him by the city for that purpose, repair the house so as to make it comply with the requirements of the Housing Code.

The judgment of the Superior Court is reversed, and the order of the Housing Commission is vacated without prejudice to the right of the city to amend its ordinance and the right of the Housing Commission thereupon to take such further action in this matter, consistent with this opinion, as it may deem advisable.

Reversed.