No. 2--00--0943

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

THE VILLAGE OF LAKE VILLA, ) Appeal from the Circuit Court

) of Lake County.

Plaintiff-Appellee, )

)

v. ) No. 98--MR--75

)

DOROTHY STOKOVICH, as Trustee, )

under Trust Agreement dated )

September 16, 1992, and )

NICK STOKOVICH, ) Honorable

) John R. Goshgarian,

Defendants-Appellants. ) Judge, Presiding.

_________________________________________________________________

JUSTICE BOWMAN delivered the opinion of the court:

Defendants, Dorothy Stokovich, as trustee under a trust agreement dated September 16, 1992, and Nick Stokovich, appeal from the judgment of the circuit court of Lake County granting plaintiff, the Village of Lake Villa, judgment on counts I and III of its second amended complaint.  Count I sought the demolition of a building in Lake Villa owned by defendants.  Count III sought fines for violations of Title 8 of the Lake Villa Village Code (the Village Code) (Lake Villa Village Code §8--4--1 (eff. April 13, 1994)).  The trial court found that the demolition order rendered moot count II, which sought alternative relief in the form of bringing the building into compliance with all current provisions of the Village Code.

On appeal defendants contend that (1) section 11--31--1 of the Illinois Municipal Code (65 ILCS 5/11-31--1 (West 1996)), pertaining to demolition by a municipality, is unconstitutional; (2) section 11-31--1 constitutes an invalid delegation of legislative power; (3) the trial court abused its discretion in excluding defendants' evidence regarding the current value of the building; (4) the trial court abused its discretion in admitting plaintiff's opinion testimony concerning the condition of the building; (5) the trial court's finding that the building was dangerous and unsafe requiring demolition under section 11--31--1 was against the manifest weight of the evidence; (6) the trial court erred in denying defendants a jury trial on count III of the second amended complaint; (7) the ordinance violations alleged in count III of the second amended complaint did not apply to vacant structures; and (8) the trial court's judgment on count III was so deficient as to require a remand.  

The property in question is a building consisting of three stories and a basement that defendant Dorothy Stokovich and her husband had acquired in 1949 and used as a nursing home until 1977.  A caretaker lived in the building from 1977 until sometime in the 1980s.  In 1979 or 1980 Mrs. Stokovich sold the building to her son, defendant Nick Stokovich, for $100,000 and gave him authority to make all decisions regarding the building.  Nick Stokovich lived in the building for approximately 12 years until 1992.  At the time of trial the building was about 100 years old.

On September 25, 1997, a red card was posted on the building indicating that it was unsafe, abandoned, dilapidated, and animal infested.  On October 3, 1997, the deputy director of the Lake County building and zoning department sent Dorothy Stokovich a letter advising her that the building was in violation of plaintiff's building code for the following reason: "unsafe abandoned structure must be brought up to the present building code or demolished."  The letter informed her that, before any repair work could be done, the department would have to conduct an inspection of the building and the proper permits would have to be secured.  If the subject property was to be demolished, the letter informed her, a demolition permit was required.  The letter also advised Mrs. Stokovich to contact the department if she had any questions concerning the matter. 

On October 17, 1997, Nick Stokovich wrote the deputy director, advising him that all future correspondence should be sent to him, as he was the owner of the building.  Stokovich informed the deputy director that he was leaving town for a few weeks, that he had advised his attorney regarding the matter, and that he hoped the  matter could be resolved upon his return or beforehand through his attorney.  

On January 7, 1998, plaintiff's attorney wrote defendants stating that the building was in a dangerous and unsafe condition and had to be demolished within 30 days.  On February 3, 1998, defendants' attorney wrote the plaintiff's attorney informing the latter that he had left a voice mail message on January 23 requesting reports plaintiff had considered concerning the condition of the subject property.  Defendants' attorney asked for  additional time to review the requested documents with defendants and to respond on their behalf.  In response, on February 18, 1998, plaintiff's attorney filed a single-count complaint for demolition and sent a copy of the complaint, which included an inspector's report, to defendants.  The inspector's report indicated that the building was unsafe, abandoned, dilapidated, and animal infested and that a red card had been posted.  

Defendants filed a motion to dismiss challenging the constitutionality of section 11-31--1 of the Illinois Municipal Code (65 ILCS 5/11--31--1 (West 1996)) on which the demolition action was based.  Following the denial of the motion, defendants filed another motion to dismiss, alleging that plaintiff's complaint failed to set forth specific facts to support plaintiff's conclusion that the building was unsafe.  The trial court granted the motion.  

Subsequently, plaintiff filed a three-count amended complaint on August 20, 1998.  Defendants moved to dismiss count III, pertaining to fines for ordinance violations, based on improper notice.  The trial court granted the motion, and plaintiff filed a second amended complaint containing the same three counts but adding notice allegations. 

Inspections of the property were conducted by plaintiff on June 4, 1998, and again on May 4, 2000.

At trial Jennifer Schaefer, a sanitarian with the Lake County health department, testified that on June 4, 1998, she inspected the building in question.  She observed mice droppings throughout the building as well as two areas with larger feces.  She did not see any evidence of animal harborage.  Schaefer also walked around the exterior of the building, observing a lot of holes and openings.  Schaefer stated that, because mice were known to carry diseases, she considered the amount of mice droppings to be a danger to humans.  As a result, Schaefer issued a notice of violation of the Lake County health ordinance to Dorothy Stokovich, directing her to remove all feces from the property.  Schaefer did not receive any communication from defendants indicating that the problem had been resolved or that any action had been taken.  

On July 31, 1998, Schaefer returned to the building and from the sidewalk observed that there were still several gaps around the building where vermin could enter it.  Schaefer sent a notice of violation to Dorothy Stokovich directing her to protect the building from the entrance of vermin.  Schaefer never received any response to the notice.

Alice Brownlee, plaintiff's clerk, testified that she was the official records custodian for plaintiff and that the water bill ledger for the building indicated that plaintiff had not provided any water to the building since March 31, 1989.

August Hibel, chief building inspector for the Lake County building department, testified that on June 4, 1998, he spent approximately 1½ to 2 hours inspecting the interior and exterior of the building to determine its existing condition and to ascertain any violations of the Village Code.  Hibel was accompanied by six other inspectors.  Photographs taken of the subject property during the inspection were admitted into evidence, as were photos taken during a subsequent inspection on May 4, 2000.   

Using the photographs, Hibel described the condition of the building at the time of both inspections.  Hibel recounted that there was extensive water damage throughout the building, broken windows that had been covered with plywood or cardboard, holes in the roof, some rotten rafters, mold and mildew on some walls, and exposed electrical wiring hanging on the ceiling in some of the bedrooms.  Additionally, portions of the siding of the overhang were missing; the plaster was falling off the walls in some rooms; some of the gutters were peeling away from the roof; the porch was sagging; and the fire escape slide on the side of the structure was badly deteriorated.  Also, there was no central heating system and no electrical power.  

Hibel stated that he was familiar with the 1993 Building Officials and Code Administrators Property Maintenance Code (BOCA Code) and that the building did not comply with many of its requirements.  In particular, the building did not meet the requirements for setbacks, guardrails, exterior walls, roof structure, overhang extensions, fire escapes, chimneys, window and door frames, guards for basement windows, interior stairway railings and widths, plumbing fixtures, heating systems, and exits.  Hibel opined that, given the exterior condition of the building, it would be unsafe for pedestrians to walk on the sidewalk near the building because of the possibility of pieces falling off the roof or the overhang.  Also, because of the lack of a heating system, electrical system, and plumbing system, no one could safely live in the building.  

Hibel opined that the building was not being maintained in a safe, sanitary, or secure condition; that it was a blight on the surrounding properties; and that it was not habitable.  In Hibel's opinion a complete remodeling of both the inside and outside of the building would be necessary to make the building habitable as a single-family residence.  In Hibel's opinion the amount of money it would take to repair the damage and deterioration to the building would exceed 50% of its market value.  Hibel did not have an opinion as to the market value of the building.  

On cross-examination, Hibel acknowledged that most of the wood in the building was "resawed" lumber and that it had greater elasticity and "sheer strength" than modern-day lumber.  Hibel also acknowledged that the porch and the addition to the building, which he had noted were sagging, had their own foundations and did not share the building's foundation.  He did not notice any significant sagging of the building.

Hibel was uncertain whether the sidewalk along the building was public or part of the building.  He recalled that one of the other inspectors told him that the building sat on the lot line.  He did not have a survey of the building nor did he ever consult a survey to determine where the lot lines were located and what the setbacks would be for the building.  

As to the defects in the two chimneys of the house, Hibel made his observation regarding open mortar joints and the breaking off of bricks from outside the house at ground level.  Hibel did not notice any bricks or debris from the chimneys on the ground.  As to other defects he had mentioned, Hibel acknowledged that there were only two areas where the gutters were actually hanging loose off the building; that the exposed electrical wirings in some rooms did not present a safety problem since there was no electricity in the building; that the interior and exterior doors did not meet BOCA Code requirements because they stuck, had hardware missing, or were themselves missing; that the guardrails were not in compliance with the BOCA Code because the openings between the slats were wider than the BOCA Code allowed; that none of the overhang on the front side of the structure, which faced the public sidewalk, hung over the sidewalk; and that, although he was uncertain whether the sidewalk running along the side of the house where a portion of the overhang went over the sidewalk was public, that sidewalk extended only to the back portion of the building and no farther. 

It was Hibel's opinion that, regardless of whether the building was inhabited or uninhabited, it still had to be in compliance with the BOCA Code.   Gary Thompson, plumbing inspector for the Lake County building department, testified that he inspected the plumbing system at the building on June 4, 1998.  Thompson stated that the plumbing system was not in accordance with current plumbing code provisions and that a whole new plumbing system would need to be installed to bring it into compliance.  A new waste and vents system would need to be installed as well as all new water lines and supplies.  Thompson stated that parts of the plumbing system dated back to the 1930s or early 1940s.  In Thompson's opinion, it would not be safe to try to salvage the existing system.

Thompson also testified that, in its present state, the plumbing system could pose a danger of contamination to the village drinking water system if there was a tie-in between the village system and the building's system because of the bacteria, mold, and mildew that would have grown into the water lines.  Thompson acknowledged that he did not determine whether the building was tied into the village system.  

Thompson said that, because some of the waste lines were open and because there was no water to keep the traps full, methane gas could possibly enter the building from the sewer line.  According to Thompson, methane gas has no odor and if it becomes concentrated in one room it would be dangerous.  Thompson admitted that he performed no tests to determine if methane gas was present.  William Wiezgac, heating inspector for the Lake County building department, who was also present at the June 4, 1998, inspection of the building, testified that the building had not been vented properly, that most of the radiators had been removed,  and that the old boiler system was one that probably had been converted to an oil-burning system and then to natural gas.  Wiezgac stated that he would not recommend trying to retrofit the old heating system instead of installing a new system because it would be more costly to operate the old system.

When asked if he felt it was safe to be in the building, given its existing conditions, Wiezgac replied that he felt safe walking through the building but that it was not safe to live in it at the present time.  

Larry Wells, structural inspector for the Lake County building department, testified that he inspected the building on May 4, 2000.  At that time the building was in a state of disrepair.  In a number of areas the roof decking was deteriorated  and rotted and there were some holes in the roof.  Also, some of the structural members of the porch were rotted or decayed.  The paint on the exterior of the building was peeling in several areas.   

William Effinger, village trustee, testified that he was very familiar with the building, as his parents lived in the same block since 1950.  Effinger described the building as "dilapidated" because a lot of the roofing was off, holes were in the roof, a lot of the windows were broken, fascia and soffits were falling off the flat roof area, and weeds were growing up in the soffits.  A couple of years prior to trial he recalled observing raccoons going in and out of the building.

Effinger stated that he was the individual who prepared the September 25, 1997, violation notice for the building and posted the red card on it.  Since that time, the property had gotten worse.  Effinger acknowledged that he observed during the May 2000 inspection that some work had been done to the building.  Some of the plaster that had fallen out had been patched, some sheets of drywall had been put over holes, and a new board had been installed in a piece of fascia outside.  Effinger also acknowledged that, during the past few years, he had observed individuals cutting the grass and removing brush piles. 

Defendant Nick Stokovich, testifying as an adverse witness, stated that, after his mother gave him the October 3, 1997, letter from the deputy director of the Lake County building and zoning department, he wrote the deputy director explaining that he was going to be out of town and asking him to contact Stokovich's attorney.  Stokovich said that he did not understand the substance of the letter.  After receiving the letter, he did not apply for or obtain a demolition or building permit for the building. 

Stokovich acknowledged receiving the January 7, 1998, letter from plaintiff's attorney telling him that the building must he demolished.  Stokovich did not apply for and obtain a demolition permit.  Nor did he make improvements to the building based on letters sent to him subsequent to the January 7 order.   Stokovich testified that, after he moved out of the building in 1992, he would visit it at least once a week.  Sometimes he would visit just to check the building.  At other times he would work on the inside of the building.  Stokovich also checked the exterior of the building during his visits.  According to him, he had never noticed any roofing, fascia, soffits, or siding material on the ground.  Stokovich also stated that the sidewalk running along the side of the house is private property and that, during his visits, he had never seen pedestrians on the sidewalk.

Stokovich testified that, after receiving the demolition demand in the January 7, 1998, letter, he spoke with the village mayor and some trustees, including Bill Effinger, regarding the building.  Stokovich expressed his desire to repair the building but indicated that, as long as there was a demolition demand, it made no sense to repair it.

Subsequent letters sent after plaintiff had brought suit sought repairs.  Stokovich testified as to repairs he had done to the building subsequent to the January 7, 1998, letter, including repairs to the interior of the building as well as to the roof.  Stokovich recalled that, when both he and a maintenance worker climbed up the escape slide, they did not notice any instability.  Stokovich also testified that, during the June 1998 inspection, for which he was present, Jennifer Schaefer pointed out some mice droppings in a corner.  Stokovich denied that she pointed out, nor did he observe, any larger feces.  Stokovich had never seen raccoons in the building.  

Stokovich stated that he had tried to keep the building secure over the past five years through locks and by boarding up some doors and windows.  Stokovich was unaware of any break-ins at the building.

Stokovich considered the January 7, 1998, letter from plaintiff's attorney to be a demolition order.  He acknowledged that he had never received a court order.  Stokovich denied ever seeing the November 17, 1998, letter from plaintiff's attorney or the December 11, 1998, letter, which attached the November 17 letter to it, indicating the repairs defendant needed to make if he chose not to demolish the building.  Plaintiff entered into evidence envelopes allegedly containing these letters and sent by certified mail that had been returned "unclaimed."  Stokovich acknowledged that he had received copies of the letters from his attorney but that he did not apply for any building permit.

The testimony of Ernest Rogalla, a structural engineer testifying on behalf of defendants, was limited to the content of the report he prepared following his inspection of the building because he had inadvertently come into the courtroom during another witness's testimony.  Rogalla stated that he specialized in restoration of old structures and in collapses and construction problems of buildings.  Rogalla said that his purpose in examining such structures was to determine their structural integrity, 
i.e.
, whether the structures were safe and whether they could be restored or repaired.  In so doing, he performed tests.  

On May 26, 1999, Rogalla spent approximately six hours inspecting the building.  Rogalla examined the exterior first and then the interior.  He observed no problems with the foundation surrounding the main building and porch area.  His examination of the foundation while in the basement of the building revealed that the masonry walls were uncracked and undamaged.  One area of the concrete portion of the basement had some surface damage, but the concrete below it was sound.  

Rogalla recalled that his examination of the roof framing and the attic area revealed no defects or structural damage.  Rogalla noticed some stains on the third-story walls from water leaking through the roof.  There was some floor damage on the third-story floors.  Rogalla discovered by cutting into areas where plaintiff had found the floors were uneven that the unevenness was related to  the tiles on the floor and that the plywood underneath was in excellent shape.  Rogalla stated that the entire roofing, 
i.e.
, shingles and waterproofing, needed to be repaired.  

On the second-story level Rogalla found that about 500 square feet of the ceiling rafters needed repairing.  On the first floor some of the ceiling rafters were soft due to moisture damage.  According to Rogalla's report, several floor boards of the porch were soft and water damaged and should be repaired.  

Rogalla also examined and tested more than half of the windows.  Those windows operated fine.  A few windows had cracks, but no whole pieces of glass were missing.  Rogalla was uncertain as to whether any windows were covered with plywood or cardboard.  Rogalla also examined the stairwells throughout the building which appeared sound and undamaged except for one basement stair step that teetered when walked upon.

On cross-examination, Rogalla acknowledged that he was unaware that the building did not meet the setback requirements for the zoning district in which it is located or that the maximum height limitation for the zoning district was less than the height of the building so that removal of the third floor might be necessary to make the structure conform.  Counsel for defendants objected to questions regarding these factors, stating that there had been no testimony or other evidence presented regarding these matters.  The objections were overruled.  Rogalla further testified that in his experience there was no reason, by virtue of "grandfathering," that any structural modifications were required for a 100-year-old building such as the  one in question.

According to Rogalla, most of the building was undamaged and repair of it appeared cheaper than tearing it down and rebuilding it.  In making his recommendation, Rogalla did not take into account the cost of installing plumbing or electrical and heating systems because he was only concerned with structural matters.

William Krueger testified that, during his 10 years of experience as a full-time contractor, he had done remodeling and "rehab" work including six to eight complete renovations of residences.  Krueger stated that he had been present on June 4, 1998, when the county inspectors had made their inspection of the building and that he had gone through the entire building.  He also rewalked the whole building in May or June 1999 to prepare an estimate for converting it into a 3-bedroom, 1½-bath, single-family residence.

Krueger described the procedure he generally followed in making an estimate.  For the building in question, he first looked at the exterior of the entire structure, then went up into the attic and worked his way downward, looking at each room and walking up and down the hallway to observe what could be salvaged and what needed removing.  He also looked at the mechanical equipment in the basement such as the electrical system.  Krueger considered the building safe to be in, as it was "very sound."

Krueger testified in detail as to the work to be done throughout the building to convert it into a single-family residence.  Krueger estimated the total cost to be approximately $64,000, but acknowledged that it could be as high as $75,000, especially if Nick Stokovich was unable to perform certain work himself.  When asked if in making his estimate he had considered that the building exceeded maximum height limitations, that the third floor might have to be removed, and that the foundation might have to be pushed back to satisfy setback requirements, Krueger replied negatively, stating that he assumed the building had been "grandfathered in."  

Desko Nokitovic, a realtor with knowledge of property values in Lake Villa, testified that he was familiar with the building, as he had been personally interested in purchasing it in 1998.  Nokitovic recalled that he had been through the entire building a few times, the last time late in 1998.  Nokitovic had also taken an interested client through the building in 1999.  

Pursuant to plaintiff's objection, Nokitovic was not allowed to testify regarding the "asking price" for the building in 1999.  Also, his opinion regarding the building's current value was excluded on objection.  Subsequently, defendants made an offer of proof that Nokitovic's opinion would have been that the building's market value in its present condition is $150,000 to $160,000 and that, if it were renovated into a 3-bedroom, 1½-bath home, the market value would be $230,000 to $240,000.

Defendant Nicholas Stokovich testified regarding his inspection of the exterior and interior of the building after a heavy snowfall in January 1999 and a severe hailstorm in May 2000.  His inspections revealed no problems with the building, 
e.g.
, no roofing materials, no siding, and no gutters had fallen off the building.  

Stokovich stated that he possessed a real estate salesperson's license and had personally bought and sold both residential and commercial property in Lake County.  He had personally renovated some of these properties.  Stokovich said that he was familiar with real estate values in Lake Villa.  His opinion regarding the market value of the building was excluded on objection, as was his testimony regarding any offers he had received to purchase it.  Defendants then made an offer of proof regarding purchase offers Stokovich had received in 1997 and 1998 in the amount of $140,000 and $150,000, respectively.

At the conclusion of the trial the court determined, as evidenced by its comments, that the building was unsafe.  In reaching its determination the court specifically mentioned Janet Schaefer's testimony regarding the possibility of communicable disease from mice droppings, Gary Thompson's testimony regarding the possibilities of methane gas in the building and of contamination of the Village's water system by defendant's water system, and Rogalla's testimony regarding the 500 square feet of ceiling rafters that needed replacement on the second story.  Based on testimony regarding the price Nick Stokovich agreed to pay his mother for the building in 1979 or 1980, the trial court found that the value of the building was $100,000.  Additionally, the court found that the renovation of the building into a single-family residence amounted to approximately $75,000, as testified to by defendants' witness Krueger, and that this renovation constituted "substantial reconstruction" of the building.  The court entered an order of demolition.  This appeal ensued.

Defendants first contend that section 11--31--1 of the Illinois Municipal Code (Code) pertaining to demolitions is unconstitutional because it does not allow a property owner the right to repair his property.  Defendant maintains that not affording a property owner the option to repair constitutes an unlawful taking without due process and without just compensation in violation of the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV) and sections 2 and 15 of the Bill of Rights of the Illinois Constitution (Ill. Const. 1970, art. I, §§2, 15).  We review the constitutionality  of a statute 
de
 
novo
.   
Miller v. Rosenberg
, 196 Ill. 2d 50, 57 (2001).  

Plaintiff asserts that defendants' constitutional arguments are barred by defendants' failure to comply with Supreme Court Rule 19 (134 Ill. 2d R. 19), which requires that notice be served upon the Attorney General in any cause in which the constitutionality of a statute affecting the public interest is raised.  However, defendants filed in this court a motion for leave to serve notice to the Illinois Attorney General and we allowed that motion.  Consequently, defendant's constitutional arguments are not barred.

The relevant portions of section 11-31--1 of the Code provide:

"(a) The corporate authorities of each municipality may demolish, repair, or enclose or cause the demolition, repair, or enclosure of dangerous and unsafe buildings or uncompleted and abandoned buildings within the territory of the municipality and may remove or cause the removal of garbage, debris, and other hazardous, noxious, or unhealthy substances or materials from those buildings.  In any county having adopted by referendum or otherwise a county health department as provided by Division 5--25 of the Counties Code or its predecessor, the county board of that county may exercise those powers with regard to dangerous and unsafe buildings or uncompleted and abandoned buildings within the territory of any city, village, or incorporated town having less than 50,000 population.

The corporate authorities shall apply to the circuit court of the county in which the building is located (i) for an order authorizing action to be taken with respect to a building if the owner or owners of the building, including the lien holders of record, after at least 15 days' written notice by mail so to do, have failed to put the building in a safe condition or to demolish it or (ii) for an order requiring the owner or owners of record to demolish, repair, or enclose the building or to remove garbage, debris, and other hazardous, noxious, or unhealthy substances or materials from the building.  It is not a defense to the cause of action that the building is boarded up or otherwise enclosed, although the court may order the defendant to have the building boarded up or otherwise enclosed."  65 ILCS 5/11--31--1 (West 1996).

In 
City of Aurora v. Meyer
, 38 Ill. 2d 131 (1967) our supreme court was faced with the same constitutional challenges to section 11--31--1 that defendants raise here.  In 
City of Aurora
 the supreme court construed the statute as meaning that, if the specific defects that render a building dangerous and unsafe "may readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs."  
City of Aurora
, 38 Ill. 2d at 137.  The supreme court declined, however, to express an opinion regarding whether the statute, as so construed, violated the constitutional provisions raised by the defendant, instead deciding that it could resolve the case without addressing the constitutional issues. 

In our previous Supreme Court Rule 23 (166 Ill. 2d R. 23) order (
Village of Lake Villa v. Stokovich
, No. 2--00--0943 (2001) (unpublished order under Supreme Court Rule 23)), we also declined to address defendants' constitutional challenges based on our finding that defendants had the opportunity to choose whether to repair or demolish their building prior to plaintiff's demand for demolition and the trial court's subsequent demolition order.  On February 28, 2002, our supreme court in the exercise of its supervisory authority directed us to vacate our affirmance of the judgment of the circuit court of Lake County ordering demolition and to address defendants' claim that section 11--31--1 is unconstitutional.  

Our research has revealed no Illinois authority that has ruled upon the constitutional challenges to section 11--31--1 that defendants raise.  Defendants have directed us to other jurisdictions that have determined that a property owner has a constitutional right to choose repair or demolition irrespective of the cost of repair.  We have found these cases instructive in reaching our decision.

Defendants argue that section 11--31--1 is unconstitutional because it fails to allow a property owner a reasonable time within which to repair his property after the receipt of a demolition notice and no opportunity whatsoever to repair after the constitutionally mandated judicial hearing has been held and a determination has been made that the property is unsafe and dangerous.  Defendants assert that ordering demolition without giving an owner a reasonable time in which to repair his property and without considering the cost constitutes an unlawful taking or a due process violation.  

Ordinarily, courts will employ a relaxed scrutiny of statutes, looking only to see whether the statute bears a reasonable relationship to a legitimate state interest.  
Tully v. Edgar
, 171 Ill. 2d 297, 304 (1996).  However, in cases where the right infringed upon is among those considered a "fundamental" constitutional right, such as a property right, courts subject the statute to "strict scrutiny."  
Tully
, 171 Ill. 2d at 304.  Under the strict scrutiny standard, the means employed by the legislature must be "necessary" to a "compelling state interest," and the statute must be narrowly tailored thereto, 
i.e.
, the legislature must use the least restrictive means consistent with the attainment of its goal.  
Tully
, 171 Ill. 2d at 304-05.

Illinois courts have long recognized that the legislative policy behind section 11--31--1 is to give municipalities the power to protect their citizens from dangerous and unsafe buildings or vacant and abandoned buildings that may prove detrimental to the public health, safety, and welfare.  See, 
e.g.
, 
City of Chicago v. Nielsen
, 38 Ill. App. 3d 941, 944 (1976) (section 11--31--1 gives the city "an effective tool for protecting its citizens from the unfortunate and degrading results of substandard and dangerous housing"); 
City of Chicago v. General Realty Corp.
, 133 Ill. App. 2d 662, 667 (1971) (the legislative policy behind section 11--31--1 is "the expeditious protection of the public from the dangers of unsafe buildings"). However, in protecting the public from dangerous and unsafe or vacant and abandoned buildings, the legislature must use the least restrictive means.  In our view, the Illinois statute goes much further than necessary to protect the public interest.  It gives minimal recognition to the right of the owner to correct defective conditions and affords local governments much discretion in selecting targets for demolition.  

We agree with defendants that section 11--31--1 provides no choice of repair.  As stated in the statute, a municipality "may demolish" or "cause the demolition" of a building it deems dangerous and unsafe without offering the owner the alternative of repair.   The statute provides no safeguards to a property owner such as requiring that an inspection be made of the property prior to the issuance of a demolition notice or requiring the municipality to cite the specific defects or conditions that make the property in question unsafe and dangerous.  The statute contains no standards or guidelines that a municipality must adhere to in determining if the property is unsafe and dangerous, yet it requires the property owner to correct the unknown conditions within 15 days.  With the exception of the 15-day period between the time of the municipality’s demolition notice and the time of the municipality’s application to the circuit court for a demolition order, an owner is allowed no time in which to make repairs.  Moreover, in our view, any defects that are so serious as to cause a municipality to issue a demolition notice would be, in many instances, impossible to repair within 15 days.  The statute affords a property owner neither a reasonable time period in which to make repairs nor the opportunity to make repairs that are not readily remedied prior to the municipality’s application to the court for a demolition order.  We agree with defendants that, as written, the statute allows municipalities "to haul property owners into court on the baldest of allegations."  

In the present case a demolition notice and the original complaint for demolition were based on an exterior visual inspection done by a village trustee who posted a red card on the building indicating  that it was unsafe, abandoned, dilapidated, and animal infested.  About a week later the deputy director of the building and zoning department informed Dorothy Stokovich by letter that the building violated plaintiff's building code.  No specific violations were cited and no inspection had been conducted of the building.  The letter simply advised "unsafe abandoned structure must be brought up to the present building code or demolished."  Likewise, when plaintiff subsequently sent defendants a notice of demolition on January 7, 1998, no specific defects or ordinance violations were cited and no inspection of the property had been conducted.  Rather, the notice merely stated the property was in a dangerous and unsafe condition.  

Up to the time of the January 7 notice, there had been no demonstrable emergency requiring the demolition of the building and no indication that the building imposed such an imminent threat to the safety of persons or property that its immediate destruction was necessary.  Defendants should have been afforded a reasonable time to repair their building so as to comply with the applicable building code requirements unless the building presented an imminent threat to the safety of persons or other property.  Under section 11--31--1, however, an owner is provided with no absolute right to choose repair and no reasonable time in which to complete the repairs prior to the municipality’s application to the court for a demolition order.  More importantly, an owner is provided with no right to repair following the court’s determination that the defects or conditions alleged by the municipality render the property unsafe and dangerous.  Yet, before any hearing and determination, it would be uncertain what, if any, alleged defects  render the property unsafe and dangerous.  Our supreme court in 
City of Aurora
 addressed the necessity for a judicial inquiry and findings prior to an owner’s obligation to make repairs.  The court stated:

"The court should find from the evidence what the specific defects are which render the building dangerous and unsafe.  If they are such as may  readily be remedied by repair, demolition should not be ordered without giving the owners a reasonable opportunity to make the repairs."  
City of Aurora
, 38 Ill. 2d at 137.

In enacting section 11--31--1, the legislature has failed to use the least restrictive means to protect the public from dangerous and unsafe or vacant and abandoned buildings.  We think the better approach would have been one similar to that employed by the legislatures of other states in enacting their demolition statutes.  Such legislative schemes are more representative of a statute that protects a compelling state interest while not infringing upon an owner's fundamental property right because they afford a property owner the choice of repair irrespective of the cost of the repairs.  See, 
e.g.
, 
Hawthorne Savings & Loan Ass'n v. City of Signal Hill
, 19 Cal. App. 4th 148, 23 Cal. Rptr. 2d 272 (1993); 
Herrit v. Code Management Appeal Board of City of Butler
, 704 A.2d 186 (Pa. Commw. 1997); 
Johnson v. City of Paducah
, 512 S.W.2d 514 (Ky. App. 1974); 
Horton v. Gulledge
, 277 N.C. 353, 177 S.E.2d 885 (1970).     

In 
Hawthorne Savings & Loan Ass'n v. City of Signal Hill
, 19 Cal. App. 4th 148, 160, 23 Cal. Rptr. 2d 272, 278 (1993), the City of Signal Hill (City) served Hawthorne Savings and Loan Association (Hawthorne) with a notice stating that a building official had determined that an apartment building complex acquired by Hawthorne through foreclosure was to be demolished.  The notice cited 170 housing code violations.  The Court of Appeals determined that the City had not afforded Hawthorne the opportunity to choose repair over demolition as required by due process and by section 17980 of California’s Health and Safety Code (Code) (Cal. Health & Safety Code §17980 (Deering 2000)).  Section 17980 of the Code specifically provided that an owner "shall have the choice of repairing or demolishing" a substandard building and that, if he chooses to repair, the building must be brought into compliance "according to a reasonable and feasible schedule for expeditious repair."  Cal. Health & Safety Code §17980(b)(1) (Deering 2000).  The court also determined that no health or safety reasons existed requiring immediate demolition and that, pursuant to statute, determining whether the buildings were suitable for repair was the owner’s decision and not the municipality’s.  
Hawthorne Savings & Loan Ass'n
, 19 Cal. App. 4th at 160-63, 23 Cal. Rptr. 2d at 278-80.    

Unlike the California statute, section 11--31--1 does not give the property owner the right to repair his property.  Rather, the statute focuses on allowing a municipality to get rid of any building that it considers dangerous without affording an owner the opportunity of doing whatever is necessary to make the building safe and at whatever cost the owner is willing to spend.  We agree with defendants that, as it presently exists, section 11--31--1 is unconstitutional because it authorizes a municipality to take private property without compensation and without due process by demolishing or requiring demolition without first giving the owner the choices of repairing the property within a reasonable time and of spending whatever it costs to bring the property into compliance.  As pointed out in 
Washington v. City of Winchester
, 861 S.W.2d 125, 127 (Ky. App. 1997), the cost of compliance as well as the method is a property owner’s decision and "far be it from the City to say how a reasonable person should spend his/her money."

In view of our determination that section 11--31--1 is unconstitutional, we vacate the judgment of the circuit court of Lake County ordering demolition and remand the cause with instructions that the court allow defendants a reasonable time in which to make repairs to their building before ordering demolition.  Our determination makes it unnecessary to address defendant's remaining issues.

Reversed and remanded with directions.

BYRNE and KAPALA, concur.