Roc F. SANSOTTA, Trustee and Executor for the Estate of Father Joseph Klaus, et al., Plaintiffs,

v.

TOWN OF NAGS HEAD, Defendant.

No. 2:10–CV–29–D.

United States District Court,
E.D. North Carolina,
Northern Division.

Signed Nov. 6, 2014.

Keith P. Anthony, Shannon R. Joseph, William J. Brian, Jr., Morningstar Law Group, Morrisville, NC, J. David Breemer, Jennifer F. Thompson, Pacific Legal Foundation, Sacramento, CA, for Plaintiffs.

Benjamin Marshall Gallop, Hornthal, Riley, Ellis & Maland, L.L.P., Nags Head, NC, John D. Leidy, M.H. Hood Ellis, L.P. Hornthal, Jr., Hornthal, Riley, Ellis & Maland, LLP, Elizabeth City, NC, for Defendant.

**ORDER**

JAMES C. DEVER III, Chief Judge.

Fundamentally, this case concerns whether the Town of Nags Head ("the Town") committed a taking in violation of the Fifth Amendment to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution by declaring plaintiffs' ("the Owners") six beachfront cottages ("the Cottages") to be public nuisances and ordering the Cot-

tages' removal without offering plaintiffs the opportunity to repair them. The controversy arose after a major storm struck the Town on November 12, 2009. During the storm, the Town determined that the road in front of the Cottages had become impassable and closed the road. The road closure prevented the Owner's contractors from accessing the Cottages to shore them up for the storm. The storm eroded the beach in front of the Cottages and damaged the Cottages themselves. On November 30, 2009, the Town condemned each of the Cottages, declared each to be a public nuisance, and ordered the Owners to remove or destroy them. The Town's decision to declare the Cottages to be nuisances was based, in part, on the Town's view that the Cottages were located in a public trust area—that is, an area for which, under North Carolina law, the State holds certain property rights in trust for the public. The Owners disagreed that their Cottages were located in a public trust area, refused to remove or destroy the Cottages, and asked for permission to repair them to a habitable state. In years past, when a storm damaged the Owners' Cottages, the Town had permitted such repairs. After the 2009 storm, however, the Town refused to do so.

In response, on May 20, 2010, the Owners sued the Town and the Town Manager, Timothy Wilson, in Dare County Superior Court, alleging numerous claims, including several federal claims. *See* [D.E. 2–1]. On June 15, 2010, the Town and Wilson removed the action to this court based on federal-question jurisdiction [D.E. 1]. On September 30, 2010, the parties stipulated to Wilson's dismissal, leaving the Town as the sole defendant [D.E. 34]. On December 8, 2010, the Owners filed their second amended complaint [D.E. 45], asserting fourteen claims against the Town:

(1) Declaratory judgment that the Cottages are not in the "public trust" area. 2d Am. Compl. ¶¶ 104–10.

(2) Declaratory judgment that the enactment of Ordinance 16–31(6)(c) is beyond the Town's authority. *Id.* ¶¶ 111–18.

(3) Declaratory judgment that the Town's actions violated N.C. Gen. Stat. §§ 160A–441 to –450. *Id.* ¶¶ 119–26.

(4) Declaratory judgment that the Town lacks the authority to declare structures on the "dry sand beach" a nuisance. *Id.* ¶¶ 127–40.

(5) Declaratory judgment that Ordinance 16–31(6)(c) does not cover the "dry sand beach." *Id.* ¶¶ 141–49.

(6) Declaratory judgment that the Town's action in restricting access to the Cottages during the November storm was unlawful. *Id.* ¶¶ 150–64.

(7) Declaratory judgment that the Town's actions deprived the Owners of their substantive due process rights under the United States and North Carolina Constitutions. *Id.* ¶¶ 165–67.

(8) Declaratory judgment that the Town's actions deprived the Owners of their procedural due process rights under the United States and North Carolina Constitutions. *Id.* ¶¶ 168–70.

(9) Declaratory judgment that the Town's actions deprived the Owners of equal protection of the law under the United States and North Carolina Constitutions. *Id.* ¶¶ 171–82.

(10) The Town acted under color of state law to deprive the Owners of their rights under the Fifth and Fourteenth Amendments of the United States Constitution, in viola-

tion of 42 U.S.C. § 1983. *Id.* ¶¶ 183–87.

(11) The Town's actions were a regulatory taking under the United States and North Carolina Constitutions. *Id.* ¶¶ 188–95.

(12) The Town's actions constituted inverse condemnation of the Cottages. *Id.* ¶¶ 196–210.

(13) The Town was negligent in preventing Sansotta's team from accessing the Cottages during the November storm and in failing to properly inspect the Cottages before issuing the Nuisance Declaration. *Id.* ¶¶ 211–26.

(14) Preliminary and permanent injunction of the Town's demolition of the Cottages, assessment of civil penalties against the Owners, and any Town action that prevents the Owners from protecting the Cottages. *Id.* ¶¶ 227–34.

On January 14, 2011, the Town answered the second amended complaint and asserted four counterclaims against the Owners [D.E. 50]:

(1) An order of abatement pursuant to N.C. Gen.Stat. § 160A–175. Town's Countercl. [D.E. 50] ¶¶ 1–50.

(2) In the alternative, an order of abatement pursuant to section 160A–193. *Id.* ¶¶ 51–62.

(3) In the alternative, an order of abatement pursuant to the common law theory of public nuisance. *Id.* ¶¶ 63–68.

(4) Recovery of civil penalties pursuant to section 160A–175. *Id.* ¶¶ 69–74.

On March 28, 2012, this court granted summary judgment to the Town on the Owners' seventh, eighth, ninth, and tenth claims, dismissed as unripe the Owners' eleventh claim (the regulatory taking claim), and remanded the remaining claims and counterclaims to Dare County Superi-

or Court. *Sansotta v. Town of Nags Head,* 863 F.Supp.2d 495, 516 (E.D.N.C. 2012). On appeal, the United States Court of Appeals for the Fourth Circuit affirmed this court's partial grant of summary judgment to the Town, but reversed this court's dismissal of the Owners' regulatory-taking claim and remanded the case for proceedings on the remaining claims. *Sansotta v. Town of Nags Head,* 724 F.3d 533, 549–50 (4th Cir.2013).

On November 6, 2013, this court held a status conference and established a briefing schedule [D.E. 169]. On January 21, 2014, the parties submitted supplemental memoranda concerning the remaining claims and counterclaims [D.E. 172, 175]. On January 31, 2014, the Owners responded [D.E. 176], and on February 1, 2014, the Town responded [D.E. 177]. The court also accepted a reply from the Owners. *See* [D.E. 180–1, 189]. On June 11, 2014, the court heard oral argument. *See* [D.E. 186]; Oral Arg. Tr. [D.E. 187]. As explained below, the court grants summary judgment to the Owners on their first, second, and fourth claims and on the Town's fourth counterclaim and denies the Town's motion for summary judgment on these claims and this counterclaim. On the Owners' sixth, seventh, eighth, and thirteenth claims, and on the block-access takings claim and the physical-occupation takings claim in the Owners' tenth, eleventh, and twelfth claims, the court grants the Town's motion for summary judgment. On the temporary-regulatory takings claim in the Owners' tenth, eleventh, and twelfth claims, and on the Town's first, second, and third counterclaims, the court denies summary judgment to both parties. The court dismisses the Owners' third and fifth claims as moot.

I.

Nags Head sits beside the Atlantic Ocean on North Carolina's Outer Banks.

Those who own oceanfront property in Nags Head reap substantial benefits from the property's location, but they also face heightened risk of property damage due to storms and beach erosion. In May 1988, the Town amended its code to establish when such erosion or storm damage could render a structure a public nuisance. *See* Nags Head, N.C., Ordinance 88–05–16 (May 2, 1988) [D.E. 115–5]. Under the ordinance,

> [t]he existence of any of the following conditions associated with storm-damaged or erosion-damaged structures or their resultant debris shall constitute a public nuisance.
>
> (a) Damaged structure in danger of collapsing;
>
> (b) Damaged structure or debris from damaged structures where it can reasonably be determined that there is a likelihood of personal or property injury;
>
> (c) Any structure, regardless of condition, or any debris from damaged structure which is located in whole or in part in a public trust area or public land.

Nags Head, N.C., Code ("Town Code") § 16–31(6) ("Nuisance Ordinance"). Subsection (c), unlike the other two subsections, concerns only a structure's location, not its condition. Even if a structure is in perfect condition, it is a nuisance under subsection (c) if it is located in a public trust area—and the only way to abate the nuisance is to remove the structure.

The Nuisance Ordinance does not define the term "public trust area," but the Town has interpreted it to include land that is subject to public trust rights, which are "those rights held in trust by the State [of North Carolina] for the use and benefit of the people of the State in common," including "the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches." *Friends of Hatteras Island Nat'l Historic Maritime Forest Land Trust for Pres., Inc. v. Coastal Res. Comm'n*, 117 N.C.App. 556, 574, 452 S.E.2d 337, 348 (1995) (quoting N.C. Gen.Stat. § 1–45.1). Although the matter is unsettled under North Carolina law, the Town contends that public trust rights apply to the entire beach, both the wet-sand and dry-sand portions.[1] *See, e.g.*, Town's Resp. Pls.' Supp. Mem. [D.E. 177] 21–24. Thus, under the Town's interpretation of subsection (c) of the Nuisance Ordinance, any structure located on any part of the beach is a nuisance.

Although subsection (c) of the Nuisance Ordinance purports to render every structure in Nags Head located "in whole or in part in a public trust area or public land" a public nuisance—and thus authorizes the Town to have every such structure demolished or removed—the Town has not attempted to enforce subsection (c) in this way. Instead, the Town developed an informal, de facto enforcement standard, focusing on the degree to which a structure obstructs the public's use of the beach. *See* Ogburn Dep. [D.E. 143–7] 289–90,

---

1. Under North Carolina law, the wet-sand beach is that portion of the beach seaward of the mean high-tide line, and is owned by the State of North Carolina. The dry-sand beach is that portion of the beach landward of the mean high-tide line, and can be privately owned. N.C. Gen.Stat. § 77–20(a); *see* Joseph J. Kalo, *The Changing Face of the Shoreline: Public and Private Rights to the Natural and Nourished Dry Sand Beaches of North Carolina*, 78 N.C. L.Rev. 1869, 1879 (2000). The mean high-tide line is a surveyed line on the beach at the average elevation reached by the water at high tide over a period of 18.6 years. *Id.* at 1882–83; *see Borax Consol., Ltd. v. City of Los Angeles*, 296 U.S. 10, 26–27, 56 S.Ct. 23, 80 L.Ed. 9 (1935); *Carolina Beach Fishing Pier. Inc. v. Town of Carolina Beach*, 277 N.C. 297, 303, 177 S.E.2d 513, 516 (1970).

Mar. 31, 2011; Ogburn Aff. [D.E. 85–3] ¶ 5, Aug. 15, 2011.

Plaintiffs Ralph and Gloria Tomita, Carole Shackelford, James Bregman, Linda Atsus, George Rusin,[2] and the estate of Joseph Klaus own the Cottages, which are located on beachfront lots at 10201, 10203, 10207, 10215, 10217, and 10221 Seagull Drive in Nags Head. *See* 2d Am. Compl. ¶ 10. Roc F. Sansotta manages the Cottages on plaintiffs' behalf and has partial ownership interests in five of the Cottages. Sansotta Aff. [D.E. 76–2] ¶¶ 2–4, Aug. 4, 2011. For over 20 years, Sansotta has buffered the Cottages with sandbags to protect the Cottages from damage. *See* 2d Am. Compl. ¶¶ 18–23. Sansotta has also taken other measures to protect the Cottages from damage, such as making structural enhancements and strategically placing additional sand around the Cottages. *See* Sansotta Dep. [D.E. 173–10] 146–47, Oct. 21, 2010; Sansotta Aff. [D.E. 76–2] ¶¶ 6–10, Aug. 4, 2011. Despite Sansotta's efforts, rising water eroded the beach in front of the Cottages, and the Cottages came to be located (in the Town's view) on the beach. According to the Town, the Cottages therefore were located "in a public trust area," and constituted a nuisance under subsection (c) of the Nuisance Ordinance. *See* Town Code § 16–31(6)(c). Initially, the Town refrained from enforcing the Nuisance Ordinance against the Cottages, apparently because they did not sufficiently obstruct the public's use and enjoyment of the beach to meet the Town's informal enforcement standard. In fact, before November 2009, the Town repeatedly allowed the Owners to continue making necessary repairs and updates to the Cottages, even though they were located (in the Town's view) on the beach. *See,*

*e.g.,* Sansotta Aff. [D.E. 172–2] ¶¶ 6, 45, Jan. 20, 2014; [D.E. 77–15]; [D.E. 78–1].

On November 12, 2009, a storm struck Nags Head (the "November Storm"). *See* Sansotta Aff. ¶¶ 10, 12, Aug. 4, 2011. In anticipation of the November Storm, Sansotta hired contractors Wilmer Harper ("Harper") and Michael Riddick ("Riddick") to protect the Cottages by moving sand around the Cottages. *See* Sansotta Dep. [D.E. 76–22] 165–67; Harper Dep. [D.E. 88–12] 53–54, June 20, 2011; Riddick Dep. [D.E. 104–5] 66. On November 11, 2009, Harper delivered additional sand to the Cottages and built up a "protective dune." Harper Dep. [D.E. 104–4] 52–53, June 20, 2011. On November 12, 2009, Harper returned to the Cottages and resumed moving sand sometime between 6:15 and 6:45 a.m. Harper Dep. [D.E. 88–12] 310, May 4, 2011; Harper Dep. 52–54, June 20, 2011. At approximately 10:00 a.m., Riddick arrived to assist Harper. Riddick Dep. [D.E. 104–5] 66. Harper and Riddick used heavy equipment, including a bulldozer, to move sand around the Cottages. Riddick Dep. [D.E. 113–8] 66–67, 71.

During the November Storm, the ocean breached Seagull Drive and washed out part of the roadway. Barile Dep. [D.E. 88–7] 50; Brinkley Dep. [D.E. 88–9] 148. The breach caused a hole to develop in Seagull Drive. *See* Brinkley Dep. [D.E. 88–9] 145–149. The November Storm also washed water and debris across Seagull Drive. Barile Dep. [D.E. 88–7] 50; Brinkley Dep. [D.E. 88–9] 145, 168. As a result, the Town erected a barricade across Seagull Drive during the morning of November 12, 2009, sometime between 8:00 a.m. and 9:00 a.m. *See* Harper Dep. [D.E. 88–12] 310, May 4, 2011; *cf.* Riddick Dep.

**2.** On May 25, 2013, George Rusin and his wife Kim Rusin transferred their ownership interest in the Cottage at 10201 Seagull Drive, at which point the Rusins no longer had an ownership interest in any of the Cottages. *See* [D.E. 177–3].

[D.E. 104–5] 67. The Town did so because it considered Seagull Drive unsafe and did not want individuals on the roadway. *See* Ogburn Dep. [D.E. 88–15] 56, Mar. 31, 2011; *cf.* Barile Dep. [D.E. 88–7] 46.

Despite the barricade, Harper and Riddick continued to work on Seagull Drive, moving sand around the Cottages. *See* Brinkley Dep. [D.E. 88–9] 145–148. At one point, Riddick and Harper filled the hole in Seagull Drive with sand and debris. *See* Brinkley Dep. [D.E. 88–9, 110–4] 145–48, 174, 177, 210. At approximately 2:00 p.m. on November 12, 2009, the Town's staff met. Osborne Dep. [D.E. 121–7] 137. At the meeting, Town officials, including police chief Kevin Brinkley ("Chief Brinkley"), learned that people were working behind the Seagull Drive barricade. *See* Wilson Dep. [D.E. 88–19] 110; Osborne Dep. [D.E. 121–7] 136–38; Brinkley Dep. [D.E. 88–9] 117.

At approximately 3:00 p.m., Chief Brinkley and additional law enforcement officers arrived at the Cottages. Brinkley Dep. [D.E. 76–11] 138–39; Sansotta Dep. [D.E. 88–18] 202–03. Chief Brinkley observed Harper and Riddick working on Seagull Drive, behind the barricade. *See* Brinkley Dep. [D.E. 88–9] 145–47. Chief Brinkley yelled to Riddick, asking who had moved the barricade. Brinkley Dep. [D.E. 88–9] 173–74; *see also* Riddick Dep. [D.E. 88–17] 140. Harper saw Chief Brinkley and approached him. Harper Dep. [D.E. 143–5] 118–19, June 20, 2011. Chief Brinkley told Harper that Seagull Drive was unsafe and that it was not safe for Harper to work behind the barricade. Brinkley Dep. [D.E. 110–4] 176–79. Chief Brinkley requested that Harper move to the other side of the barricade. Brinkley Dep. [D.E. 110–4] 183; Harper Dep. [D.E. 143–5] 119–20, June 20, 2011; *see* Sansotta Dep. [D.E. 88–18] 199. After speaking with Chief Brinkley, Harper called Sansotta, who happened to be en route to Seagull Drive. *Cf.* Sansotta Dep. [D.E. 88–18] 200–01; Harper Dep. [D.E. 104–4] 130, June 20, 2011. When Sansotta arrived, Harper informed Sansotta of Chief Brinkley's instructions. Sansotta Dep. [D.E. 88–18] 201–02. Sansotta did not speak with Chief Brinkley. Sansotta Dep. [D.E. 88–18] 201. Harper and Riddick stopped working and moved their equipment to the other side of the barricade. Harper Dep. [D.E. 104–4, 143–5] 120, 137, June 20, 2011; Sansotta Dep. [D.E. 104–6] 226.

The storm substantially eroded what beach remained in front of the Cottages, and caused significant damage to the Cottages' septic systems and some damage to the Cottages themselves. Sansotta Aff. ¶¶ 11–12, Aug. 4, 2011; Sansotta Dep. [D.E. 76–22] 259–263. After inspecting the post-storm state of the Cottages, the Town sent the Owners of each cottage a letter. The letters were dated November 30, 2009, and declared that each Cottage created "a likelihood of personal or property injury" and that each was "located in whole or in part in a public trust area," and accordingly declaring each Cottage to be a nuisance under subsections (b) and (c) of the Nuisance Ordinance. [D.E. 77–7] ("Nuisance Declaration"); *see* Town Code § 16–31(6)(b), (c). The determinations under subsections (b) and (c) were related: the fact that the Cottages were located in what the Town viewed as an area open to the public made the damaged state of the Cottages more likely to pose a danger of injury to the public. *See* Ogburn Dep. [D.E. 76–9] 205, Mar. 31, 2011 ("My concern was that [ ] these homes are in whole or in part on the public trust and the people that have the right to be in that area are going to be subject to injury from the damaged structure and debris.").

Because the Nuisance Declaration was based on the Cottages' location, and not just their condition, the Town determined

that even if the Owners repaired the Cottages they would remain nuisances. *See* Ogburn Dep. [D.E. 76–19] 157–62, Mar. 31, 2011. Thus, the Town ordered the Owners "to promptly abate [the] nuisance[s] by demolishing and/or removing the structure[s] and any accessory structures within 18 days," and warned the Owners that if they failed to demolish or remove the Cottages, the Town would begin issuing civil citations in the amount of $100 per day per Cottage. [D.E. 77–7]; *see also* Ogburn Dep. [D.E. 76–19] 153–58, Mar. 31, 2011. In addition, the Town informed the Owners that it would not issue any building permits for repairs to the Cottages, *see* [D.E. 77–7], and instructed the Town staff accordingly. *See* [D.E. 95–10]; Ogburn Dep. [D.E. 88–15] 168, Mar. 31, 2011. The Owners refused to demolish the Cottages, and on January 27, 2010, the Town began assessing $100–per–day–per–Cottage civil penalties against the Owners. *See* [D.E. 76–4]. Before the Nuisance Declaration, the Owners' properties (including the Cottages) were collectively valued at $1,400,000. *See* [D.E. 173–29]. After the Nuisance Declaration, Dare County listed each of the Owners' properties as "WASH-OUT," with a value of $0. *See* [D.E. 173–30].

Sometime between November 2009 and March 2010, the Town realized that it did not have the legal authority to deny building permits for a structure just because it had been declared a nuisance. *See* Wilson Dep. [D.E. 173–24] 260; Ogburn Dep. [D.E. 173–5] 168–71, Mar. 31, 2011. Not wanting to issue building permits for structures it had ordered to be removed or destroyed, the Town's Board of Commissioners enacted Ordinance No. 10–07–021 on July 7, 2010. *See* [D.E. 79–8]. This ordinance gave the Town the legal authority it had lacked. Nags Head, N.C., Ordinance No. 10–07–021 (July 7, 2010) [D.E. 79–8] ("Ordinance 10–07–021"); *see* Oakes Dep. [D.E. 114–12] 218–19; [D.E. 115–20] (transcript of July 7, 2010 meeting of the Nags Head Town Council). Specifically, Ordinance 10–07–021 amended the Town's zoning ordinances to define as "prohibited" structures located

> (i) Wholly within the wet sand area of the public trust beach area; i.e., on the state owned property seaward of the mean high water mark; or

> (ii) Wholly or partially within any portion of the public trust beach area in such a manner that the building or structure impedes the flow of vehicular, pedestrian, or emergency services traffic at normal high tide.

Town Code § 48–87(c).[3] Furthermore, Ordinance 10–07–021 specified that any structure that had been declared a nuisance pursuant to subsection (c) of the Nuisance Ordinance automatically would be considered "prohibited." *Id.* Ordinance 10–07–021 also declared that no building permit could be issued for a prohibited structure, other than permits to remove or demolish the structure. *Id.; see id.* § 16–33(c).

Barred by Ordinance 10–07–021 from receiving the necessary building permits, the Owners were unable to repair the Cottages to a habitable state. *See* Sansotta Aff. [D.E. 172–2] ¶ 31, Jan. 20, 2014. Left unrepaired, the Cottages were exposed to the elements and to vandalism, and their condition deteriorated substantially. *See id.* Thus, the Cottages remained uninhabitable and the Owners were unable to rent,

---

**3.** Ordinance 10–07–021 defined the term "public trust beach area" to include both the wet-sand and dry-sand portions of the beach, consistent with the Town's interpretation of the term "public trust area" in subsection (c) of the Nuisance Ordinance. *See* [D.E. 79–8] 3.

use, or otherwise enjoy the Cottages. *See id.* ¶ 46.

On August 6 and 7, 2011, the Town renourished the portion of the beach in front of the Cottages with additional sand. *See* Sansotta Aff. [D.E. 173–32] ¶¶ 9, 13, Sept. 8, 2011. After renourishment, the Town found that the Cottages "no longer impermissibly or unacceptably restrict[ed] or obstruct[ed] the use of and access to the ocean beach" and, on September 14, 2011, declared that the Cottages were no longer nuisances under subsection (c) of the Nuisance Ordinance. *See* [D.E. 121–2] 2. The Town also found, however, that "the Cottages "continue[d] to constitute a nuisance under [subsection (b)]" because, in the Town's view, the Cottages remained reasonably likely to cause personal or property injury." *Id.* Moreover, the Town stated that the Cottages remain on the public trust area, meaning that the Town could, consistent with subsection (c) of the Nuisance Ordinance, redeclare the Cottages to be a nuisance at any time. *See id.; cf.* Ogburn Dep. [D.E. 176–2] 161–62, Sept 14, 2011.

Once the Town declared that the Cottages were no longer nuisances pursuant to subsection (c) of the Nuisance Ordinance, Ordinance 10–07–021 no longer barred the Owners from obtaining building permits. After obtaining authorization from the Dare County Department of Public Health, the Owners began their efforts to repair the Cottages. *See* Sansotta Aff. ¶¶ 8–11, Jan. 20, 2014; [D.E. 172–4]. In order to install a new septic system and to do other required repairs, the Owners had to obtain the "minor development permit" required by North Carolina's Coastal Area Management Act ("CAMA"). Under CAMA, this permit is required for any sort of construction work in an "area of environmental concern" such as the oceanfront beach.

Although the Town normally processes CAMA minor development permit applications on behalf of North Carolina's Division of Coastal Management ("DCM"), in this case, due to the ongoing litigation, the Town asked DCM to process the application. *See* Teague Aff. [D.E. 177–5] ¶¶ 15–17. DCM did so, and on February 27, 2012, DCM denied the Owners' application upon finding that, due to the Cottages' proximity to the ocean, installing a new septic system for the Cottages would violate both CAMA guidelines and the Town's Land Use Plan. *See* Sansotta Aff. ¶ 17, Jan. 20, 2014; [D.E. 172–5]. The Owners appealed, and ultimately reached a settlement with DCM through which DCM agreed to exempt the proposed repairs to the Cottages from the CAMA minor-development-permit requirement. *See* Sansotta Aff. ¶ 20, Jan. 20, 2014. The Owners received letters of exemption from DCM for each of the Cottages between August 28, 2013, and October 7, 2013. *See id.* ¶ 22; [D.E. 172–6]. By then, the Owners' authorization for septic-tank work from the Dare County Department of Public Health was over two years old; therefore, the Owners obtained an updated authorization on September 17, 2013. *See* Sansotta Aff. ¶ 23, Jan. 20, 2014; Broom Aff. [D.E. 174–1] ¶ 17, Jan. 19, 2014; [D.E. 174–6]. At that point, the Owners began applying for building permits from the Town. As of June 10, 2014, the Town had granted building permits for five of the six Cottages, and the Owners had begun repairing those Cottages. *See* Broom Aff. [D.E. 185–2] ¶¶ 9, 20, June 10, 2014; Broom Aff. ¶¶ 32, 35, Jan. 19, 2014; Teague Aff. ¶ 25. As for the sixth Cottage, the permit application was pending while the Owners and the Town attempted to see if they could agree on how to make the repairs compliant with the Town's regulations. *See* Broom Aff. ¶ 10, June 10, 2014.

## II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See, e.g.,* Fed.R.Civ.P. 56; *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party has met its burden, summary judgment is appropriate unless the nonmoving party can affirmatively demonstrate that there exists a genuine issue of material fact for trial. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Conjectural arguments will not suffice. *See id.* at 249–52, 106 S.Ct. 2505; *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985) ("The nonmoving party ... cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere ... scintilla of evidence in support of the [nonmoving party's] position ... be [ ]sufficient; there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence (such as hearsay) described in such affidavits. *See* Fed. R.Civ.P. 56(c); *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir.1996). Likewise, a party opposing summary judgment may not disclaim admissions made under Rule 36 of the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 36(b); *New Amsterdam Cas. Co. v. Waller,* 323 F.2d 20, 24 (4th Cir.1963). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 354 (4th Cir.2011).

### A.

In their first claim, the Owners originally sought a declaration that, among other things, "none of the Cottages ... are located within the Public Trust." 2d Am. Compl. ¶¶ 104–10. The Owners have since clarified that they are not asking the court to determine the extent of the public trust doctrine but are asking only for a determination that the Cottages are not located on the wet-sand portion of the beach, which the State of North Carolina owns. *See* Owners' Supp. Mem. [D.E. 172] 14. A survey conducted on July 25, 2011, shows that no part of the Cottages was located on the wet-sand beach. *See* [D.E. 173–4]. Moreover, at oral argument, the Town admitted that it had no evidence regarding the position of the Cottages relative to the mean high-tide line and conceded that "[f]rom the last survey in the record [the Cottages] probably were not on the wet sand beach." Oral Arg. Tr. 25. Accordingly, the court grants summary judgment to the Owners on their first claim and declares that none of the Cottages are located on the wet-sand beach.

■ In their second claim, the Owners seek a declaratory judgment that, by enacting subsection (c) of the Nuisance Ordinance, the Town exceeded the authority

delegated to it by the North Carolina General Assembly. 2d Am. Compl. ¶¶ 111–18. Through subsection (c), the Town attempts to enforce public trust rights. In *Town of Nags Head v. Cherry, Inc.*, the North Carolina Court of Appeals held that only the State, acting through the Attorney General, has the authority to enforce public trust rights. 219 N.C.App. 66, 74–75, 723 S.E.2d 156, 160–61, *disc. rev. denied*, 366 N.C. 386, 733 S.E.2d 85 (2012); *see also Town of Nags Head v. Toloczko*, 728 F.3d 391, 397–98 (4th Cir.2013). Accordingly, the court grants summary judgment to the Owners on their second claim and declares that the Town lacked authority from the North Carolina General Assembly to enact subsection (c) of the Nuisance Ordinance.

In their third claim, the Owners seek a declaratory judgment that, by ordering them to demolish the Cottages without first holding a hearing, the Town violated N.C. Gen.Stat. §§ 160A–441 to 160A–450. 2d Am. Compl. ¶¶ 119–26. Now that the Town has withdrawn the subsection (c) Nuisance Declaration, the Town no longer demands that the Owners demolish the Cottages. *Cf.* [D.E. 121–2] 2. Thus, the court dismisses this claim as moot. *See, e.g., Alvarez v. Smith*, 558 U.S. 87, 93–94, 130 S.Ct. 576, 175 L.Ed.2d 447 (2009); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108–09, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Renne v. Geary*, 501 U.S. 312, 320–21, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir.2006); *Reyes v. City of Lynchburg*, 300 F.3d 449, 453 (4th Cir. 2002); *Jones v. Poindexter*, 903 F.2d 1006, 1009 (4th Cir.1990).

▮ In their fourth claim, the Owners seek a declaratory judgment that the Town lacks the authority to declare a structure to be a public nuisance solely because it is located on the dry-sand beach. 2d Am. Compl. ¶¶ 127–40. This claim arises from the Town's position that the dry-sand beach is part of the "public trust area," and that structures "located in whole or in part" on the dry-sand beach are nuisances under subsection (c) of the Nuisance Ordinance. In *Cherry*, the North Carolina Court of Appeals held that only the State, acting through the Attorney General, has the authority to enforce public trust rights. 219 N.C.App. at 74–75, 723 S.E.2d at 160–61; *see also Toloczko*, 728 F.3d at 397–98. Accordingly, the court grants summary judgment to the Owners on their fourth claim and declares that the Town has no authority to declare a structure to be a public nuisance solely because it is located on the dry-sand beach.

In their fifth claim, the Owners seek a declaration that the term "public trust area" in subsection (c) of the Nuisance Ordinance includes only the wet-sand beach, and not the dry-sand beach. 2d Am. Compl. ¶¶ 141–49 In light of the court's conclusion that the Town had no authority to enact subsection (c) of the Nuisance Ordinance, the court need not interpret subsection (c). *Cf. Cherry*, 219 N.C.App. at 74–75, 723 S.E.2d at 160–61. Thus, the court dismisses the Owners' fifth claim as moot.

▮ In their sixth claim, the Owners seek a declaration that the Town had no authority to prevent Sansotta or his contractors from accessing the Cottages during the November Storm. 2d Am. Compl. ¶¶ 150–64. The court may issue a declaratory judgment only "[i]n a case of actual controversy." 28 U.S.C. § 2201. To determine whether an actual controversy exists, the court examines "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judg-

ment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *see, e.g., White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167–68 (4th Cir.1990). Here, there is no live controversy. Accordingly, the court declines to issue a declaratory judgment and grants summary judgment to the Town on the Owners' sixth claim.

▮ In their seventh claim, the Owners seek a declaration that the Town violated their substantive due process rights under Article I, Section 19 of the North Carolina Constitution and the Fourteenth Amendment of the United States Constitution. 2d Am. Compl. ¶¶ 165–67. In their eighth claim, the Owners seek a declaration that the Town violated their procedural due process rights under Article I, Section 19 of the North Carolina Constitution and the Fourteenth Amendment of the United States Constitution. 2d Am. Compl. ¶¶ 168–70. On March 28, 2012, the court granted summary judgment to the Town on the Owners' seventh and eighth claims. *Sansotta*, 863 F.Supp.2d at 505–11. The Owners did not appeal the court's decision on their seventh claim, and the Fourth Circuit affirmed the court's decision on the Owners' eighth claim. *Sansotta*, 724 F.3d at 539–42 & n. 6. The Owners assert that these prior decisions addressed only their federal due process claims and not their state due process claims. *See* Owners' Supp. Mem. 15–16. However, neither this court's analysis nor the Fourth Circuit's analysis distinguished between the Owners' federal and state claims, with good reason: "North Carolina courts have consistently interpreted the due process ... clause[ ] of the North Carolina Constitution as synonymous with [its] Fourteenth Amendment counterpart[ ]." *Tri County Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 435 n. 6 (4th Cir.2002). Accordingly, the court grants summary judgment to the Town on the Owners' seventh and eighth claims.

The Owners have withdrawn their ninth claim. *See* Owners' Supp. Mem. 16–17. Thus, the Owners' ninth claim is no longer in this case.

▮ In their thirteenth claim, the Owners seek damages for negligence and allege that the Town was negligent under North Carolina law by preventing Sansotta and his contractors from accessing the Cottages during the November Storm and by failing to properly inspect the Cottages before declaring that they violated the Nuisance Ordinance.2d Am. Compl. ¶¶ 211–26. The public duty doctrine, however, defeats this claim. Under the public duty doctrine, a state or municipal government is free to enact laws for public protection without exposing the government to liability for failing to properly enforce such laws, including negligent enforcement. *See, e.g., Hunt v. N.C. Dep't of Labor*, 348 N.C. 192, 196, 499 S.E.2d 747, 749–50 (1998); *Braswell v. Braswell*, 330 N.C. 363, 370–71, 410 S.E.2d 897, 901 (1991); *Christmas v. Cabarrus Cnty.*, 192 N.C.App. 227, 232–33, 664 S.E.2d 649, 652–53 (2008), *disc. rev. denied* 363 N.C. 372, 678 S.E.2d 234, 235 (2009). Moreover, the record demonstrates that the two narrow exceptions to the public duty doctrine do not apply. *See Braswell*, 330 N.C. at 371, 410 S.E.2d at 902. Under these two narrow exceptions, a government can be liable (1) where there is a special relationship between the governmental entity and the injured party; or (2) where the governmental entity creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered. *See, e.g., Hunt*, 348 N.C. at 197–99, 499 S.E.2d at 750–51; *Scott v. City of Charlotte*, 203 N.C.App. 460, 470–72, 691 S.E.2d 747, 754–55 (2010); *Lane v. City of Kinston*, 142 N.C.App. 622, 626–27, 544

S.E.2d 810, 814 (2001). Accordingly, the court grants summary judgment to the Town on claim thirteen.

 In their fourteenth claim, the Owners ask the court to enjoin the Town from demolishing the Cottages, assessing or enforcing civil penalties against the Owners, or taking "any other adverse action" against the Owners concerning the Cottages. *See* 2d Am. Compl. ¶¶ 227–34. The court need not enjoin the Town from destroying the Cottages because the Town no longer seeks to destroy the Cottages, and the Owners have not offered evidence that the Town is likely to do so in the future. *See, e.g., Alvarez,* 558 U.S. at 93–94, 130 S.Ct. 576; *Steel Co.,* 523 U.S. at 108–09; 118 S.Ct. 1003; *Renne,* 501 U.S. at 320–21, 111 S.Ct. 2331; *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–13, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669. The court also need not enjoin the Town from assessing or enforcing civil penalties against the Owners in light of the court's decision to grant summary judgment to the Owners on the Town's counterclaim for civil penalties. Finally, the court will not enjoin the Town from taking "any other adverse action" against the Owners concerning the Cottages because such adverse action is, at this point, only "conjectural or hypothetical." *Lebron v. Rumsfeld,* 670 F.3d 540, 560 (4th Cir.2012); *see Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 32–33, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

### B.

 In their tenth claim, the Owners allege that the Town, acting under color of state law, has deprived them of their right not to have their property taken by the government without just compensation, in violation of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution. *See* 2d Am. Compl. ¶¶ 183–87. In their eleventh claim, the Owners assert the same claim directly under the federal Takings Clause and the Law of the Land Clause of the North Carolina Constitution. *See* 2d Am. Compl. ¶¶ 188–95; U.S. Const. amend. V, amend. XIV, § 1; N.C. Const. art. I, § 19.[4] In their twelfth claim, the Owners claim that the Town condemned their property without filing formal condemnation proceedings (i.e., inverse condemnation). *See* 2d Am. Compl. ¶¶ 196–210; N.C. Gen.Stat. § 40A–51; *Long v. City of Charlotte,* 306 N.C. 187, 199–202, 293 S.E.2d 101, 109–11 (1982). The Owners' tenth, eleventh, and twelfth claims are materially indistinguishable. All depend on whether the Town's actions constituted a taking under the Fifth Amendment. Accordingly, the court analyzes these three claims together.[5]

**4.** The court assumes without deciding that the Owners can bring the federal portion of claim eleven directly under the Takings Clause. *See First English Evangelical Lutheran Church v. Cnty. of Los Angeles,* 482 U.S. 304, 316 n. 9, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1,* 220 F.3d 298, 302 n. 4 (4th Cir.2000); *cf. City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 709–22, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (analyzing a takings claim brought under 42 U.S.C. § 1983 and the Takings Clause).

**5.** Claim eleven, unlike claims ten and twelve, relies on the Law of the Land Clause of the North Carolina Constitution in addition to the Fifth Amendment Takings Clause. *See* 2d Am. Compl. ¶ 189. Although the North Carolina Constitution does not expressly prohibit governments from taking private property for public use without just compensation, the Supreme Court of North Carolina has found such a prohibition in the Law of the Land Clause. *See, e.g., Finch v. City of Durham,* 325 N.C. 352, 362–63, 384 S.E.2d 8, 14 (1989). The Supreme Court of North Carolina uses the same standard for determining whether a government took property in violation of the North Carolina Constitution as the Supreme Court of the United States uses to assess a Fifth Amendment takings claim. *See,*

The Fifth Amendment Takings Clause applies to the States through the Fourteenth Amendment. *See, e.g., Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). It provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This prohibition "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). It applies to temporary government actions as well as permanent ones. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *First English Evangelical Lutheran Church,* 482 U.S. at 318–19, 107 S.Ct. 2378; *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va.,* 135 F.3d 275, 285 (4th Cir.1998).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle,* 544 U.S. at 537, 125 S.Ct. 2074. For example, when the government uses its eminent domain power to condemn a person's land for some public purpose (such as to build a road or a military base), the government has "taken" that land and must pay just compensation for it. *See, e.g., Ark. Game & Fish Comm'n v. United States,* — U.S. —, 133 S.Ct. 511, 518, 184 L.Ed.2d 417 (2012); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 713–15, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010); *Lingle,* 544 U.S. at 537, 125 S.Ct.

2074; *Tahoe–Sierra,* 535 U.S. at 321–22, 122 S.Ct. 1465.

A taking also occurs, however, when instead of appropriating or invading private property, the government undertakes "regulatory actions that are functionally equivalent to the classic taking." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074. "[N]o magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Ark. Game & Fish Comm'n,* 133 S.Ct. at 518; *see Stop the Beach Renourishment, Inc.,* 560 U.S. at 713, 130 S.Ct. 2592. Nonetheless, the Court has identified two situations in which a regulation will, per se, constitute a taking. First, a regulation is a taking if it authorizes a "permanent physical occupation" of properly. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *see, e.g., Ark. Game & Fish Comm'n,* 133 S.Ct. at 518. Second, a regulation is a taking if it requires a property owner to sacrifice all economically beneficial use of the property, unless the regulation does no more than enforce limits that "inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).[6]

Regulations that fit neither per se rule are evaluated using the multi-factor balancing test in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631(1978). *See Ark. Game & Fish Comm'n,* 133 S.Ct.

---

*e.g., Finch,* 325 N.C. at 371–72, 384 S.E.2d at 19; *N.C. Dep't of Transp. v. Cromartie,* 214 N.C.App. 307, 314–15, 716 S.E.2d 361, 367 (2011); *Adams Outdoor Adver. of Charlotte v. N.C. Dep't of Transp.,* 112 N.C.App. 120, 122, 434 S.E.2d 666, 667 (1993).

**6.** This principle also applies under the North Carolina Constitution. *See, e.g., Helms v. City of Charlotte,* 255 N.C. 647, 655–57, 122 S.E.2d 817, 824–25 (1961).

at 518; *Lingle,* 544 U.S. at 538–39, 125 S.Ct. 2074. The so-called *"Penn Central* factors" include (1) the regulation's economic impact on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable, investment-backed expectations, and (3) the character of the government's action. *See Lingle,* 544 U.S. at 538–39, 125 S.Ct. 2074; *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. A regulatory taking (just like a "classic taking") can be either permanent or temporary. *See Tahoe–Sierra,* 535 U.S. at 322–23, 122 S.Ct. 1465; *Lucas,* 505 U.S. at 1030 n. 17, 112 S.Ct. 2886; *First English Evangelical Lutheran Church,* 482 U.S. at 318–19, 107 S.Ct. 2378.

The Owners claim that the Town's regulatory actions effected a taking of their property in three ways. First, the Owners claim that the Town committed a taking by blocking the Owners' contractors from working during the November Storm. *See* Owners' Supp. Mem. 17. Second, the Owners claim that, by stating in the Nuisance Declaration that the Cottages were located in a public trust area, the Town effected a physical-occupation taking of their property under *Loretto* and its progeny. *See id.* 18–25. Third, the Owners claim that, when the Nuisance Declaration was in effect, and until November 15, 2013, the Town's refusal to issue permits deprived them of the ability to use or rent the Cottages—a deprivation which the Owners claim effected a temporary regulatory taking under *Penn Central. See id.* 25–30. The court addresses each claim in turn.

■■■■ As for the Owners' first takings theory, the government is "absolv[ed] … of liability for the destruction of real and personal property, in cases of actual necessity, to prevent the spreading of a fire or to forestall other grave threats to the lives and property of others." *Lucas,* 505 U.S. at 1029 n. 16, 112 S.Ct. 2886; *see*

*TrinCo Inv. Co. v. United States,* 722 F.3d 1375, 1377–80 (Fed.Cir.2013). Here, the evidence shows that, once Seagull Drive had been breached, the Town's emergency-management personnel were concerned about the safety of the contractors and those who might need to rescue the contractors should they be injured. Even viewing the evidence in the light most favorable to the Owners, the Owners' first takings theory fails.

■■■■ As for the Owners' second takings theory, when a regulatory action authorizes "a permanent physical occupation of property," the action effects "a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only a minimal impact on the owner." *Loretto,* 458 U.S. at 434–35, 102 S.Ct. 3164. For example, in *Loretto,* the Court held that the government committed a taking when it enacted a statute authorizing a cable television company to install cable lines on private property without the property owner's consent. *See id.* at 423–26, 102 S.Ct. 3164. In finding a taking, the Court emphasized that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property." *Id.* at 436, 102 S.Ct. 3164. Moreover, the cable company's "direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall" permanently appropriated the owner's property. *Id.* at 436–38, 102 S.Ct. 3164; *see Stop the Beach Renourishment, Inc.,* 560 U.S. at 713, 130 S.Ct. 2592. Similarly, in *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Court held that the Army Corps of Engineers had committed a taking when it imposed a federal navigational servitude on a private pond in Hawaii. In

*Kaiser Aetna,* the landowner made extensive improvements to a private pond, including connecting the pond to the navigable waters of the United States. *Id.* at 167–68, 100 S.Ct. 383. Nonetheless, the landowner took the position that the pond remained private property and that the landowner could deny public access to the pond. *See id.* at 168, 100 S.Ct. 383. The Army Corps of Engineers disagreed and imposed a federal navigational servitude. In doing so, the Corps told the landowner that the landowner was precluded from denying public access to the pond because, as a result of improvements by the landowner, the pond had become a navigable water of the United States. *See id.* at 170, 176, 100 S.Ct. 383. In finding a taking, the Court emphasized several factors. First, before the improvements to the pond, the pond was not capable of being used for navigation in interstate commerce. *Id.* at 178, 100 S.Ct. 383. Second, the pond had always been considered private property under Hawaii law. *Id.* at 179, 100 S.Ct. 383. Third, the navigational servitude "w[ould] result in an actual physical invasion of the privately owned marina" and thereby deprive the owner of the owner's right to exclude. *Id.* at 179–80, 100 S.Ct. 383; *see also, e.g., Love Terminal Partners v. United States,* 97 Fed.Cl. 355, 412–14, 424–25 (2011) (finding that Congress effected a taking when it mandated the demolition of gates at the claimant's airport terminal).

In *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the Court applied the *Loretto* "permanent physical occupation" rule in the context of public beach access. In *Nollan,* the Nollans applied for a permit from the California Coastal Commission to demolish their dilapidated oceanfront cottage and replace it with a new, larger cottage. 483 U.S. at 828, 107 S.Ct. 3141. The Commission granted the per-· mit, but only on the condition that the

Nollans grant, in return, a public easement across the beach portion of their property. *Id.* In analyzing the takings claim, the Court explained that if the Commission had "simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access across the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, [there is] no doubt there would have been a taking." *Id.* at 831, 107 S.Ct. 3141. The Court held that a "permanent physical occupation" occurs when "individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Id.* at 832, 107 S.Ct. 3141. The Court concluded that the public easement condition constituted a taking. *Id.* at 841–42, 107 S.Ct. 3141.

The Owners claim that the Town gave the beachgoing public just such a right through its repeated assertions that the portion of the Owners' property located on the dry-sand beach was within the public trust. *See, e.g.,* [D.E. 77–7] 3 (asserting, in the Nuisance Declaration, that the Cottages are located "within the public trust"); [D.E. 121–2] 2 (stating, in the letter withdrawing the Nuisance Declaration, that "[t]his decision is not because the Cottages are no longer located on the public trust area or public land because they clearly still are"). Indeed, the Town took the position at oral argument that, before the North Carolina Court of Appeals decided *Cherry,* the Owners could not have built a fence around the portion of their property located on the dry-sand beach. *See* Oral Arg. Tr. 54–55.

The court rejects the Owners' physical-occupation takings claim. In *Nollan, Loretto,* and *Kaiser Aetna,* it was clear that,

before the government acted, the property owner had the exclusive right to use the property at issue, and the government action at issue had (or would have) the legal effect of depriving the property owner of that right. *See Nollan,* 483 U.S. at 827–29, 107 S.Ct. 3141; *Loretto,* 458 U.S. at 421–24, 102 S.Ct. 3164; *Kaiser Aetna,* 444 U.S. at 166–68, 174, 100 S.Ct. 383. Here, in contrast, the Town stated its understanding of a long-existing relationship between the public's access rights to the dry-sand beach and the Owners' private property rights, and initiated nuisance litigation in an effort to determine whether its understanding was correct. *Cf.* Kalo, *supra,* at 1892–97 (describing North Carolina law, distinguishing between ownership of the dry-sand beach and the public's right to access the dry-sand beach, and noting the lack of clarity under North Carolina law concerning whether the public has a limited right of access to the dry-sand beach). The Town did not, however, authorize the public to invade the Owners' property, erect signs inviting the public onto the Owners' property, or take any other action to license or require a physical invasion of the Owners' property. Moreover, this court has not located a single case from the Supreme Court of the United States, the Fourth Circuit, or any other court finding a physical-occupation taking based solely on the initiation of nuisance litigation without some government action licensing or requiring an actual physical invasion of the private property. *Compare Loretto,* 458 U.S. at 427–38, 441, 102 S.Ct. 3164, and *Kaiser Aetna,* 444 U.S. at 178–80, 100 S.Ct. 383, *and Love Terminal Partners,* 97 Fed.Cl. at 412–14, 424–25, *with Yee v. City of Escondido,* 503 U.S. 519, 529–32, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (finding no physical-occupation taking when the government enacted a regulation preventing mobile-home-park owners from setting certain rents and placing limits on who tenants could be, but leaving to owners the right to determine whether to use their land as a mobile home park at all), *and FCC v. Fla. Power Corp.,* 480 U.S. 245, 250–54, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987) (finding no physical-occupation taking when the government regulated the rates that power companies could charge cable companies for pole attachments but did not require that the power companies allow attachments or agree to physical occupations of their property), *and Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 92–95 (2d Cir.1992) (finding no physical-occupation taking when the government denied a land-use permit under a state land-use statute that prohibited the owner from developing 33 lots in a deeryard habitat), *and Esposito v. S.C. Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991) (finding no physical-occupation taking when the government prohibited any new construction on property owners' oceanfront lots); *see also PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 82–84, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (finding no physical-occupation taking where the government forced a shopping-center owner who made its shopping center open to the public to allow reasonable speech and petitioning activities on the owner's property). Simply put, in expressing its opinion about the scope of the public trust, the Town did not require the Owners to suffer a physical occupation of their property or license others to invade the Owners' property. *Cf. Yee,* 503 U.S. at 532, 112 S.Ct. 1522 ("Had the city['s regulation] required such an occupation, of course, petitioners would have a right to compensation...."); *Fla. Power Corp.,* 480 U.S. at 252–53, 107 S.Ct. 1107 ("The line which separates [this case] from *Loretto* is the unambiguous distinction between a ... lessee and an interloper with a government license."); *Loretto,* 458 U.S. at 440, 102 S.Ct. 3164 ("So long as these regulations do not *require* the land-

lord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor [*Penn Central*] inquiry generally applicable to nonpossessory government activity." (emphasis added)). Moreover, no record evidence shows that any member of the public relied on the Town's opinion about the scope of the public trust in deciding whether to cross the portion of the Owners' land located on the dry-sand beach. Thus, on this record, the Town's opinion about the scope of the public trust did not effect a physical occupation of the Owners' property.

The Owners' third takings theory is that the Town deprived them of the ability to use or rent the Cottages by issuing the Nuisance Declaration and then refusing, until recently, to issue building permits for the Cottages. The Owners contend that this deprivation effected a taking under *Penn Central.* The Town, citing the Fourth Circuit's *Sansotta* decision, responds that it never deprived the Owners of a property right. *See* Town's Supp. Mem. [D.E. 175] 13–15; Town's Resp. Pls.' Supp. Mem. 24–27. The Town also responds that it did not cause the Owner's claimed injuries.

■ The court rejects the Town's argument that the Fourth Circuit's *Sansotta* decision compels the conclusion that the Town did not deprive the Owners of any property right. The Town emphasizes that the Fourth Circuit rejected the Owners' procedural due process claim on the ground that the Town's actions had not deprived the Owners of a constitutionally cognizable property right. *See Sansotta,* 724 F.3d at 540–42 (holding that the Owners have a constitutionally protected property interest in the money that would be used to pay a fine and in "the right to use and enjoy the cottages as part of their fee simple ownership," but that they failed to prove that the Town had deprived them of

these property interests under the Due Process Clause). In *Sansotta,* however, the Fourth Circuit did not address whether the Owners have a property interest in their lost rental income, in their right to exclude, or in their right to be paid for an easement. *See id.* More fundamentally, *Lingle* clarified that due process inquiries and takings inquiries are not the same, and the Fourth Circuit expressly declined to comment on the merits of the takings claim. *Id.* at 549 n. 23, 125 S.Ct. 2074; *see Lingle,* 544 U.S. at 540–43, 125 S.Ct. 2074. Thus, the Fourth Circuit's procedural due process analysis does not control the Owners' takings claim.

■ Next, the Town correctly notes that the Owners have no right to use their property in a manner inconsistent with the State's background principles of nuisance law. Town's Resp. Pls.' Supp. Mem. 24; *see Lucas,* 505 U.S. at 1029–30, 112 S.Ct. 2886. But even assuming that damage from the November Storm caused the Cottages to become nuisances, no evidence suggests the Cottages would have continued to be nuisances had the Town allowed the Owners to repair them, as North Carolina law obligated the Town to do. *See Horton v. Gulledge,* 277 N.C. 353, 363, 177 S.E.2d 885, 892 (1970), *overruled on other grounds by State v. Jones,* 305 N.C. 520, 290 S.E.2d 675 (1982); *cf. Cherry,* 219 N.C.App. at 80, 723 S.E.2d at 164. Instead, the evidence, taken in the light most favorable to the Owners, shows that the Owners would have done what they always did in the wake of a storm: work to repair the Cottages so they could use them like thousands of other North Carolinians with beachfront homes, as a place to live themselves and to rent to others. *Cf. Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886 ("The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law

prohibition...."). No rational jury could find that such use constitutes a nuisance under the background principles of North Carolina common law. *See, e.g., State v. Everhardt,* 203 N.C. 610, 166 S.E. 738, 742 (1932) ("Whatever tends to endanger life, or generate disease, and affects the health of the community; whatever shocks the public morals and sense of decency ... is generally, at common law, a public nuisance, and a crime."). Moreover, to the extent the Town contends that the·public trust doctrine is a background principle of North Carolina property law and independently limited how the Owners could use their Cottages, *Cherry* established that only the State can enforce the public trust doctrine, and the State of North Carolina has not intervened in this litigation to assert its rights under the public trust doctrine. *See Cherry,* 219 N.C.App. at 74–75, 723 S.E.2d at 160–61; *see also Toloczko,* 728 F.3d at 397–98. Thus, in this unique case, the court predicts that the Supreme Court of North Carolina would not apply the public trust doctrine to defeat the Owners' takings claim.[7]

■ Next, the court analyzes the *Penn Central* factors to determine whether a genuine issue of material fact exists concerning whether the deprivation was sufficiently serious to constitute a taking. Under *Penn Central,* the court must first consider the economic impact of the Town's actions on the Owners' property. Because the Town refused to allow the Owners to repair the Cottages, the Owners could not use or rent them. As a consequence, the Owners estimate that they lost more than $260,000 in rental income. *See* Owners' Supp. Mem. 27. Moreover, after

the Nuisance Declaration, the Owners' property went from being collectively valued at $1,400,000 to being deemed washouts with a value of $0—a total loss of value. *See* [D.E. 173–29, 173–30]. Thus, this factor appears to weigh heavily in favor of the Owners.

■ Next, the court must consider the extent to which the Town's refusal to issue permits to repair the Cottages interfered with the Owners' reasonable, investment-backed expectations about the use of their property. The court looks "to the existing use of property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel.'" *Esposito,* 939 F.2d at 170 (quoting *Penn Cent.,* 438 U.S. at 136, 98 S.Ct. 2646); *see also Nat'l Adver. Co. v. City of Raleigh,* 947 F.2d 1158, 1162 (4th Cir.1991). For example, in *Penn Central,* the court found no taking in part because the regulation at issue allowed the existing use of the claimant's property to continue. *See Penn Cent.,* 438 U.S. at 136, 98 S.Ct. 2646. Here, in contrast, the Town reversed its past practice of allowing the Owners to rebuild and repair the Cottages after storm damage, preventing the Owners from using the Cottages the way they always had. To be sure, the Owners have been on notice that the beach in front of the Cottages is eroding and may eventually erode to the point that the Cottages can no longer legally or practically be repaired. Nonetheless, the Owners rightly expected that the Town would not attempt to accelerate that process through its unauthorized assertion of the public trust doctrine. Thus, this factor also appears to weigh in favor of the Owners.

7. To the extent that the Town contends that the doctrine of custom inheres in the Owners' titles and defeats the Owners' takings claim, the court predicts that the Supreme Court of North Carolina would reject that defense in this case. *See, e.g., Severance v. Patterson,* 370

S.W.3d 705, 727–32 (Tex.2012). In reaching this conclusion the court does not address anything other than the record in this unique case or any property other than the property at issue in this unique case.

Finally, the court must consider the character of the Town's actions, "for instance whether [they] amount[ed] to a physical invasion or instead merely affect[ed] property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074 (quotation omitted). One hallmark of a regulation that does not effect a taking is that it secures an "average reciprocity of advantage" for those affected. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). For example, a zoning regulation may prevent a property owner from building a high-rise apartment in a suburban neighborhood, but the value of that owner's property is protected because his neighbors cannot build a high-rise apartment either.

Here, there appears to be no reciprocity of advantage. The Owners and other similarly situated property owners bore the entire burden of the Town's efforts to free the dry-sand beaches of residential structures but received none of the benefit. Had the Town succeeded in having the Cottages demolished, the result would not have been a mere adjustment of the benefits and burdens of economic life. Rather, the result would have been an outright transfer of wealth from the Owners to the beachgoing public and to those who own the would-be oceanfront cottages behind the Owners' Cottages. Such a transfer of wealth has the character of a taking. Thus, this factor also appears to weigh in favor of the Owners.

In its defense, the Town takes a different view of the evidence concerning the three *Penn Central* factors. *Cf. Naegele Outdoor Adver., Inc. v. City of Durham,* 844 F.2d 172, 176–77 (4th Cir.1988) (explaining that "[r]esolution of the dispute by plenary hearing rather than by summary judgment is particularly important in cases involving claims of regulatory taking," in light of the "ad hoc factual inquiries" inherent in the *Penn Central* factors). The Town also asserts that the Owners' inability to repair the Cottages while under the subsection (c) Nuisance Declaration and thereafter was, in effect, the result of factors other than the Town's actions. Essentially, the Town argues that genuine issues of material fact exist concerning the three *Penn Central* factors and whether the Town's actions proximately caused the Owners' alleged harm. The Supreme Court of North Carolina has defined proximate cause as follows:

[A] cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Adams v. Mills,* 312 N.C. 181, 192–93, 322 S.E.2d 164, 172 (1984) (quotation omitted). "Proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." *Williams v. Carolina Power & Light Co.,* 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979) (quotation and alteration omitted). Genuine issues of material fact exist concerning the three *Penn Central* factors and proximate cause. *Cf. Naegele Outdoor Adver., Inc.,* 844 F.2d at 176–77. A jury will have to determine whether the Town committed a temporary regulatory taking of the Owners' Cottages. The period in dispute began on November 30, 2009, when the Town issued the Nuisance Declaration, and according to the Owners, continued after the Town lifted the subsection

(c) Nuisance Declaration and through the time it has taken them to actually obtain all the permits they needed to repair the Cottages. *Cf. First English Evangelical Lutheran Church,* 482 U.S. at 321, 107 S.Ct. 2378 (distinguishing "normal delays in obtaining building permits" from the sort of government action that supports a temporary taking).

In sum, the court grants summary judgment to the Town on the portion of claims ten, eleven, and twelve concerning the Owners' block-access takings claim and the physical-occupation takings claim. The court denies summary judgment to the Town and to the Owners on the portion of claims ten, eleven, and twelve concerning the Owners' temporary regulatory takings claim.

### C.

In its first counterclaim, the Town alleges that the Cottages constitute nuisances under subsection (b) of the Town's Nuisance Ordinance and seeks "an order of abatement directing each Plaintiff, at their sole expense, to immediately abate the nuisance conditions on their Property." Countercl. ¶¶ 1–50. The Town's third counterclaim is materially indistinguishable. *See* Oral Arg. Tr. 11. In its second counterclaim, the Town alleges that the Cottages constitute nuisances under N.C. Gen.Stat. § 160A–193 and seeks "an order of abatement permitting the Town to summarily remove, correct, abate, or otherwise remedy the nuisance conditions now existing" on the Owners' property at the Owners' sole expense. Countercl. ¶¶ 51–62. The court denies summary judgment on the Town's first, second, and third counterclaims, and orders each party to update the court on the status of the Owners' efforts to repair the Cottages. The update

is due on December 5, 2014. Once the court receives the update, it will revisit whether to grant summary judgment to the Owners on the Town's first, second, and third counterclaims.

In its fourth counterclaim, the Town seeks to recover civil penalties from plaintiffs for their failure to obey the Town's nuisance-abatement order. Countercl. ¶¶ 69–74. The Town has assessed a $100 civil penalty against each Owner each day from January 27, 2010, through the present, and continuing until the Town sees fit to issue a Certificate of Occupancy for each Owner's cottage. *See* Oral Arg. Tr. 13–14.

■ The Town's claim for civil penalties fails. The Town's purported sources of authority for ordering the Owners to demolish the Cottages were subsections (b) and (c) of the Nuisance Ordinance. *See* [D.E. 77-7]; Town Code § 16–31(6)(b), (c). Neither subsection can sustain the Town's order. As for subsection (c), under North Carolina law, only the State, acting through the Attorney General, has the authority to enforce public trust rights. *See Cherry,* 219 N.C.App. at 74–75, 723 S.E.2d at 160–61.[8] Thus, the Town did not have the authority to declare the Cottages a public nuisance solely because of their location in what the Town considers to be a public trust area.

■ Subsection (b), unlike subsection (c), falls within the scope of the police powers the State of North Carolina has delegated to the Town. *See* N.C.Gen.Stat. §§ 160A–174, 160A–193. The Town, however, lacks the power under North Carolina law to order the destruction of a structure without first giving the owner a reasonable opportunity to repair it, unless

---

**8.** Until the Supreme Court of North Carolina says otherwise, the North Carolina Court of Appeals decision in *Cherry* articulates North

Carolina law. *See Toloczko,* 728 F.3d at 397–98.

the structure poses "an imminent threat to the public." *Monroe v. City of New Bern*, 158 N.C.App. 275, 278–80, 580 S.E.2d 372, 374–75 (2003); *see Horton*, 277 N.C. at 363, 177 S.E.2d at 892 ("To require [a structure's] destruction, without giving [its] owner a reasonable opportunity thus to remove the existing threat to the public health, safety[,] and welfare, is arbitrary and unreasonable."); *cf. Hillsboro Partners, LLC v. City of Fayetteville*, 738 S.E.2d 819, 827 (N.C.Ct.App.2013) (upholding a local government's destruction of a nuisance property where the owner had been provided an opportunity to repair the property and had failed to do so); *Cherry*, 219 N.C.App. at 80, 723 S.E.2d at 164. The record conclusively shows that the Town did not provide the Owners a reasonable opportunity to repair the Cottages before it began assessing civil penalties, and that the Cottages did not pose an imminent threat to the public. Thus, the Town lacked authority to order the Owners to destroy the Cottages. The Town cannot recover civil penalties for the Owners' refusal to obey an order it lacked authority to enter. Accordingly, the court grants summary judgment to the Owners on the Town's claim for civil penalties.

## III.

In sum, on the Owners' first, second, and fourth claims and on the Town's fourth counterclaim, the court GRANTS the Owners' motion for summary judgment and DENIES the Town's motion for summary judgment. On the Owners' sixth, seventh, eighth, and thirteenth claims, and on the block-access takings claim and the physical-occupation takings claim in the Owners' tenth, eleventh, and twelfth claims, the court GRANTS the Town's motion for summary judgment. On the temporary-regulatory-takings claim in the Owners' tenth, eleventh, and twelfth claims, and on the Town's first, second, and third counterclaims, the court DE-

NIES summary judgment to both parties. Each party shall update the court on the status of the Owners' efforts to repair the Cottages. The update is due on December 5, 2014. Upon receiving the update, the court will revisit whether to grant summary judgment to the Owners' on the Town's first, second, and third counterclaims. The court DISMISSES the Owners' third and fifth claims as moot. The parties shall consult and submit a proposed schedule for resolving the remaining issues. The proposed schedule also is due on December 5, 2014. The proposed schedule will include proposed trial dates. The parties shall advise the court of the anticipated number of trial days but should not expect that the court will give either side all the days requested. A single jury will resolve the issue of liability and damages.